Raymond A. Biggs and Joan Biggs v. Commissioner.
Biggs v. Commissioner
Docket Nos. 3958-62, 4003-65.
United States Tax Court
T.C. Memo 1968-240; 1968 Tax Ct. Memo LEXIS 59; 27 T.C.M. (CCH) 1177; T.C.M. (RIA) 68240; October 16, 1968. Filed James F. Shea, Marvin I. Bannon, Guardian Bldg., Detroit, Mich., and Frederick William Heath, Penobscot Bldg., Detroit, Mich. for the petitioners. Eugene M. Corbin, Charles R. Abbott, and Joseph F. Dillon, for *61 the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent determined deficiencies in and additions to petitioners' income tax for the taxable years as follows: Addition to
Addition to
Addition to
Addition to
tax Sec.
tax Sec. 294
tax Sec.
tax Sec.
293(b)
(d)(1)(A)
6653(b)
6653(a)
Year *
Deficiency
1939 Code
1939 Code
1954 Code
1954 Code
1950
$ 45,367.12
$22,683.56
$8,187.26
0
0
1951
58,365.86
29,182.93
0
0
0
1952
93,786.54
46,893.27
0
0
0
1953
139,851.66
69,925.83
0
0
0
1954
154,874.52
0
0
$77,437.26
0
1955
192,511.43
0
0
97,755.53
0
1956
158,389.19
0
0
83,626.43
0
1957
185,285.88
0
0
92,642.94
0
1959
90,556.00
0
0
0
$4,527.80
1960
109,587.34
0
0
0
5,479.37
1961
98,578.61
0
0
0
4,928.93 1182 General Background This case involves the returns of petitioners for 11 taxable years (1950 through 1957 and 1959 through 1961). It represents the culmination of petitioners' almost continuous disagreement with respondent since 1944 as concerns their liability for *62 Federal income taxes. The investigation which resulted in the deficiencies asserted herein commenced in 1958. It took an enormous amount of time and presented great difficulties - stemming in large degree from the inadequacies of petitioners' books and records and the manner of reporting income and deductions in their tax returns. Petitioners from time to time executed consents extending the periods of limitation on assessment. The deficiency notices for the taxable years 1950 through 1957 and 1959 through 1961 were mailed to petitioners on June 29, 1962 and April 7, 1965, respectively. The difficulties encountered in the examination of petitioners' returns continued to inhibit preparation of both sides for trial - difficulties compounded by petitioners' inability, if not outright refusal, to cooperate with their attorneys and several changes of counsel, the last of which took place on the eve of trial. Only after strenuous efforts on the part of the Court over a period of 15 months to persuade the parties to stipulate facts (four separate stipulations of fact were ultimately filed) and to settle certain issues, largely in the area of alleged omissions from income, was it possible *63 to proceed with the trial. Even then a substantial amount of time was consumed by the testimony, much of which was confusing and for the most part extremely general in nature. Petitioner Raymond A. Biggs during the years in question earned large amounts of income. Even allowing for payments to "other doctors" (which were themselves the subject of dispute on the audit of petitioners' returns), he reported gross income from his profession of between $200,000 and $300,000 in all but two of the years involved and only slightly less than $200,000 in those two years. Petitioners claimed large amounts of deductible expenses in a variety of categories in each year. The disputed areas in each year involved alleged omissions from business income, excessive deductions for purported business expenses and a myriad of other issues relating to substantiation of itemized deductions, the tax consequences of isolated transactions, dependency exemptions, etc. Practically all of the disputed items of alleged omission from business income involved reconciliation of gross receipts from a medical practice on the basis of available records (including the amounts shown to have been paid on the records *64 of the Michigan United Medical Service) and the question of the measure of the tax liability of petitioner, Raymond A. Biggs, on income earned by a clinic purportedly owned by members of his family. These items were for the most part settled prior to trial, thereby reducing the alleged omissions from income with respect to gross receipts from profession, for all the years involved herein, from an aggregate of some $220,000 to an aggregate of $55,000 and with respect to clinic income from an aggregate of some $355,000 to an aggregate of some $135,000. An additional aggregate amount in 1954, 1956, and 1957 of approximately $112,000 of omitted business income was conceded by respondent as not having been omitted. In addition, petitioners conceded the omission from gross income during the years involved of an aggregate of approximately $3,900 in dividends and of approximately $5,100 in rental income with respect to amounts paid in connection with stocks and real estate owned by petitioner Raymond A. Biggs but which he directed to be paid to his children. Petitioners similarly conceded that they had omitted an aggregate of approximately $5,500 interest income from gross income during the *65 years involved. The trial itself was confined primarily to the large deductions which petitioners had taken on their returns, most of which were purportedly for business expenses and a sizeable percentage of which were by way of cash expenditures. Some of the amounts claimed have been allowed by respondent. In addition, he has conceded additional amounts as to the fact of expenditure but not as to business purpose. Other amounts are in dispute as to the fact of expenditure as well as the purpose. A coherent breakdown by category is virtually impossible but the approximate amounts set forth in the table below generally indicate the magnitude of the problem in the area of purported business expenses. Some 16 to 20 categories of expense are reflected (including depreciation and purported rental expense by way of payments to a related corporate entity). 1183 Conceded as to
Disputed as to
fact of
both fact of
expenditure but
expenditure and
Claimed
not business
business
Year
on return
At issue *
purpose
purpose
1950
$ 40,600
$ 29,500
$ 3,300
$ 26,200
1951
62,600
48,000
6,800
22,000
1952
118,900
58,300
8,800
30,600
1953
93,900 42,500
4,200
36,000
1954
131,200
60,600
12,800
45,100
1955
167,200
114,000
26,300
56,400
1956
199,400
92,000
50,000
39,000
1957
191,100
90,000
44,200
33,130
Total
$1,004,900
534,900
$156,400
$288,430
1959
83,700
59,600
57,000
2,400
1960
85,600
47,800
47,400
400
1961
104,900
73,700
73,700
0
Total
$ 274,200
$181,100
$178,100
$ 2,800
Grand
$1,279,100
$716,000
$334,500
$291,230
total
*66 Thus, we are left with essentially the following areas of decision: (1) To what extent are petitioners entitled to the numberous claimed deductions for business expenses and other itemized amounts? (2) To what extent did petitioners realize ordinary income or capital gain on certain isolated, essentially nonbusiness transactions? (3) Did petitioners properly claim certain dependents as exemptions? (4) Was any part of the deficiency for each of the years 1950-57 due to fraud? (5) Was any part of the deficiency for each of the years 1959-61 due to negligence or intentional disregard of rules and regulations? (6) Are petitioners liable for an addition to tax for the taxable year 1950 because of their failure to file a timely declaration of estimated tax? Because of the number of years involved, the gross inadequacy of petitioners' books and records, and the general nature of much of the testimony, [1] we have encountered particular difficulty in determining the extent to which *67 they are entitled to deductions for ordinary and necessary business expenses. Petitioners on brief attempt to remedy the deficiencies in the record by ex cathedra assertions, but this is obviously unacceptable. We are satisfied, however, that the amounts of some of the deductions should be greater than those conceded by respondent. But we think it equally clear that such deductions should be less than the amounts claimed by petitioners. In arriving at the allowable amounts reflected in our various findings of fact, we have considered both specific testimony and the record as a whole and have borne heavily on petitioners, as we must, since the inadequacies of the records herein are of their own making. Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930).
General Findings of Fact
*68 Some of the facts have been stipulated and are found accordingly. All general findings of fact and all findings of fact under each issue separately dealt with herein are incorporated by reference to the extent applicable in respect of any and every other issue. Where an affirmative finding of fact as to all or part of an alleged deductible item is omitted, such as involved in claimed ordinary and necessary business expenses, it shall be deemed that such items are not deductible because the facts do not show that the amount involved satisfied the requirements for deductibility. Raymond A. and Joan Biggs (hereinafter sometimes referred to as "Joan") are husband and wife who had their legal residence 1184 in Detroit, Michigan, at the time of filing their petitions herein. They filed their returns for the years 1950 through 1952 with the collector of internal revenue, Detroit, Michigan, and for the balance of the years at issue with the district director of internal revenue, Detroit, Michigan. Raymond will hereinafter be referred to as petitioner. Petitioner had four children, Beverly (now Beverly Potts), Raymond Biggs, Jr. (hereinafter referred to as "Ray"), Thomas Biggs, *69 and Nancy Biggs. Beverly was born prior to 1932. Ray was born on June 6, 1937, Thomas on May 8, 1939, while Nancy was born in 1943. Petitioner was 64 years of age at the time of trial. He is the son of a coal miner from a small town in southern Illinois. At an early date, he became interested in osteopathy and surgery. He graduated from college as an osteopath in 1925 and, after graduate education and training, became an osteopathic surgeon in 1935. As of the time of the trial herein, he had performed approximately 50,000 operations on persons from all walks of life. Over the years, his practice has generally been centered in the area of Detroit, Michigan, but from time to time he has engaged in professional activity at various clinics and hospitals (some of international reputation) and with respect to various patients located throughout the United States and abroad. He is considered highly competent and highly successful in his profession. Petitioner's efforts to achieve his professional reputation and standing were complicated by the uncertain relationship of osteopaths and osteopathic surgeons to the medical profession and the second-class status in which they have historically *70 been regarded by the members of that profession, by medical organizations and governmental authorities, and, indeed, by the general public. Petitioner considered this situation a substantial handicap to the development of his career. The situation has improved substantially in the past 20 years but full recognition and standing of the osteopathic profession has not yet been achieved. Petitioner worked long hours six or seven days a week. He was dedicated to his profession and convinced - to the point of having an obsession - that, in order to make money, he had to spend money. In keeping with this conviction, he treated his professional colleagues, associates, and others who worked with him and for him handsomely, both in terms of his personal relations with them and the financial benefits which he bestowed upon them. He traveled widely. He entertained lavishly. Many members of petitioner's family participated in various aspects of his daily life and he paid them substantial amounts purportedly for services rendered. Throughout the years involved herein, petitioner proceeded on the assumption, which he seemingly saw no reason to question, that his life was his business, and vice *71 versa, and that magnanimous spending was necessarily required to further his practice and his professional reputation either directly or through the general enhancement of the osteopathic fraternity. Petitioner was a compulsively hard liver as well as a hard worker. With respect to petitioner's books and records, Joan oversaw the daily recording of income for petitioner. She and Lucille Hutchins, Joan's mother (hereinafter sometimes referred to as "Lucille") prepared the daily deposits. Lucille would then transmit the deposits to the bank. Joan, with the assistance of Lucille, prepared monthly summaries which were forwarded to M. Fred Pike, the accountant who prepared petitioner's tax returns for the years in question, except for 1961. Shortly after the end of the year, Pike would go over petitioner's cancelled checks and the other records that were submitted to him. After consultation with petitioner, Joan, and Lucille, Pike would prepare work papers for the year's income and expenditures. Numerous items of expenditures were not substantiated by checks. Petitioner expended large sums of cash without keeping careful records of the time, place, nature, and amounts. Many of the expenditure *72 figures appearing in Pike's work papers represent rough estimates made by petitioner in consultation with Pike at the end of the year, often in round amounts, such as $500, $1,000, etc., even though many of the items and the expenditures involved were of a character and size which would normally be expected to be evidenced by a check or at least a receipted bill (e.g., surgical and office supplies). The work papers frequently do not identify the payee, nor do they indicate the specific purpose of the expenditure other than to identify the broad category to which the expenditure belongs. The work papers merely summarized each year's operations in order to provide a basis for preparing tax returns. 1185 Petitioner's books and records were grossly inadequate. Generally two sets of deductions were claimed on the tax returns - Deductions from Gross Receipts from Profession - Schedule C (i.e., deductions purportedly relating to his practice of osteopathy) and Itemized Deductions. However, in 1950 through 1952, Gross Receipts from Profession was separated into two categories, the income from the Gratiot Clinic being reported separately from Referred Case Income (apparently income from *73 surgery earned directly by petitioner). The former was reported on a separate income schedule attached to the return and entitled Income from Clinic. This schedule contained its own separate schedule of deductions generally divided into the same categories as the deductions claimed on the Referred Case Income schedule. In addition, in 1950, petitioner attached a third schedule of income and deductions entitled Loss from Gas Station. The deductions claimed thereon generally were divided into the same categories as those claimed on the other schedules. Petitioner's returns broke the deductions down into broad categories which frequently overlapped. For example, travel expenses were claimed, inter alia, under the following categories: Travel, Entertainment and Promotion, and Itemized Deductions. Many expenses that properly should have been classified as Entertainment and Promotion were claimed under numerous other categories. Consistent with petitioner's assumption as to the business orientation of his expenditures, all questions as to the propriety of deductions were resolved in favor of deductibility. A similar pattern of decision in petitioner's favor was adopted with respect to *74 includability of items in gross income. For example, petitioner owned a parcel of real estate sometimes referred to herein as the "Plymouth Road property." In order to provide his daughter, Beverly, her husband, and their two children with some income while her husband was in college, petitioner directed the tenants to pay the rent directly to Beverly and her husband. It appears that they included the rents on their gross income for Federal tax purposes while petitioner excluded the rents from his gross income. For the same reasons, and with the same result, petitioner directed the Detroit Edison Company to pay the dividends on certain of its shares held by him directly to Beverly and her husband. Petitioner has now conceded error with respect to both these items. From 1950 to 1952, petitioner maintained his office at 11025 Gratiot Avenue, Detroit, Michigan, (referred to herein as the "Gratiot Clinic"). Petitioner owned the property on which the Clinic was located. Sometime in January 1953, a partnership composed of petitioner's four children was formed to operate the Gratiot Clinic. The interests of each of the three youngest children were held in three separate trusts. Lucille *75 Hutchins was the trustee in each case. The property on which the Clinic was located was not transferred to the partnership, ownership thereof continuing in petitioner. Petitioner reported no income from the operation of the clinic after 1952, all of it being reported by the four partners. The parties have now stipulated that a portion of the Gratiot Clinic income should be allocated to petitioner. Sometime in 1950 or 1951, petitioner acquired a site at 215 Highland Avenue, Highland Park, Michigan. A new building was erected and petitioner moved his office to this building in April 1952. This office will be referred to herein as the "Highland Clinic." Sometime after petitioner moved into the Highland Clinic, the Detroit Osteopathic Hospital, where petitioner performed most of his operations, was constructed across the street from the Highland Clinic. This hospital was a fledgling institution with only 28 beds and a small staff when petitioner received his preceptorship training there in the early 1930's. It is now an established, well-regarded institution with 378 beds and a sizeable staff. In 1955, petitioner transferred the Highland Clinic property, the Gratiot Clinic property, *76 and a gas station to newlycreated and wholly owned Hamilton Corporation. Subsequently, he transferred other assets to Hamilton Corporation, including a Florida apartment. One of the issues involved herein relates to the consequences of the original transfer while another issue relates to rent purportedly paid to Hamilton for the transferred facilities. Preliminary Matters Initially we need to dispose of the contentions that (1) the deficiency notices failed to give petitioners adequate information to enable them to prepare and try the issues involved herein and (2) the consents extending the period of limitations for the years involved herein are invalid because 1186 of the alleged "arbitrary and capricious actions of the Respondent in deliberately withholding the essentials of his determination from Petitioners necessary to their preparation of their cases until long after the consents themselves expired and long after their case was docketed for trial * * *." As a consequence, it is claimed that respondent's actions denied petitioners a fair hearing and were violative of due process of law, with the result that we are asked to dismiss the cases with prejudice or, alternatively, *77 to rule that the entire burden of proof on all issues is on the respondent. We hold that the contentions are wholly without merit and deny the requested relief. The deficiency notices were sufficiently detailed to provide petitioners with adequate information as to the basis for the asserted deficiencies. This was clearly the case with the items which remain at issue and we think it can fairly be concluded that the notices sufficiently apprised petitioners with respect to the items of omitted income which were settled in advance of trial. Whatever difficulties petitioners may have encountered in analyzing the various items reflected in the deficiency notices stemmed to a very large degree from the gross inadequacies in their books and records, the manner - confusing to say the least - in which their returns were submitted, and their failure to cooperate with their attorneys. Moreover, it appears that petitioners had ample opportunity, by way of motions or other procedures which might have been available to them under the Rules of Practice of this Court, to obtain further information from respondent. They never did so, although Docket No. 3958-62 (involving the taxable years 1950 *78 through 1957) was at issue on February 14, 1963 and Docket No. 4003-65 (involving the taxable years 1959 through 1961) was at issue on August 30, 1965 and the trial did not start until September 12, 1967. What is more, the revenue agent's report for the years 1950 through 1957 was furnished to petitioners' counsel in April 1964 and the agent was subjected to extensive examination with respect to his report as a witness in September 1966. We hold that the deficiency notices were valid and subsisting at all times pertinent. Cf. Marx v. Commissioner, 179 F. 2d 938 (C.A. 1, 1950); Millar Brainard, 7 T.C. 1180, 1185 (1946n8. As far as the consents extending the period of limitations are concerned, petitioners do not claim that they were not validly and timely executed. Their claim is that, due to respondent's subsequent conduct, they lost their validity at some later point of time. Even if consents may be held to have their vitality sapped in this fashion (an issue which we do not decide), we think that what little evidence there is in the record in fact fails to disclose that respondent's conduct vitiated their validity in any way and that, consequently, *79 petitioners have, in any event, failed to carry their burden of proof as to this contention. Cf. Willhoit v. Commissioner, 308 F. 2d 259 (C.A. 9, 1962), affirming on this issue a Memorandum Opinion of this Court; Concrete Engineering Co., 19 B.T.A. 212, 221 (1930), affd. 58 F. 2d 566 (C.A. 8, 1932). Secretarial and Other Services and Salaries Findings of Fact Petitioner claimed and respondent disallowed deductions under the categories of secretarial and other services and salaries as follows: Year
Category
Amount claimed
Amount allowed
Amount still at
by respondent
issue
1950
Secretarial and
$ 3,285.40
$ 1,185.40
$ 2,100.00
other services
Salaries (paid to
8,052.00
5,642.95
2,409.05
C. J. Briggs)
1951
Secretarial and
2,239.00
739.00
1,500.00
other services
1952
Secretarial and
3,817.92
3,817.92
other services
Salaries
12,560.60
6,640.60
5,920.00
1953
Secretarial and
6,629.65
10,869.75
other services
1954
Secretarial and
12,082.33
9,312.33
2,770.00
other services
1955
Secretarial and
12,705.24
6,842.85
5,862.39
other services
1956
Secretarial and
21,191.55
15,668.32
5,523.23
other services
1957
Secretarial and
23,323.20
7,000.00
16,323.20
other services
1959
Secretarial and
18,763.50
12,104.50
6,659.00
other services
1960
Salaries
32,691.69
27,189.35
5,502.34
1961
Salaries
25,060.76
19,360.76
5,700.00
*80 1187 The amounts disallowed under the categories of secretarial and other services and salaries consist of amounts claimed to have been paid (mostly in cash) to Ray, Thomas, Beverly, Lucille, C. J. Biggs, and Maude Dent for services rendered to petitioner in connection with his professional as well as amounts shown on Pike's work papers without identifying the payee. Frequently the payments to members of petitioner's family occurred in lump sums around Christmastime. Ray and Thomas, petitioner's sons, performed various miscellaneous services for petitioner during the years in question. Because they were students at the time, the services for the most part were performed on weekends and during vacations. The services included maintenance and repairs at the Highland Avenue clinic, driving petitioner from the house to the hospital, maintaining a converted PT Boat, and running errands, such as to purchase surgical supplies and flowers. Lucille's compensation by petitioner derived from her assisting Joan with the reports and her carrying the daily deposit to the bank. Prior to his death in 1954 at the age of 75, C. J. Biggs, petitioner's father, performed various carpentry and *81 maintenance services, principally at the Clinic at 215 Highland Avenue. Maude Dent, petitioner's maid, served petitioner in both a business capacity and a personal capacity. Her position required her to answer the telephone as well as to perform the normal services of a maid. She answered an average of 15 business calls per day, carefully recording the message and transmitting it to petitioner. A portion of her services as petitioner's maid required her to assist in the planning of, and preparation for, parties where petitioner purportedly entertained business guests in his home. Included in the amounts claimed by petitioner in 1955 under the category of secretarial and other services was $1,287.39 paid to Dr. E. Deane Elsea, an associate of Dr. Biggs. In addition to the amounts already allowed by respondent, the following amounts were paid by petitioner and are ordinary and necessary expenses under the categories of secretarial and other services and salaries: Year
Amount
1950
$ 700.00
1951
175.00
1952
875.00
1954
$ 675.00
1955
* 2,087.39
1956
1,050.00
1957
3,250.00
1959
1,300.00
1960
1,100.00
1961
1,150.00
*82 Opinion Petitioner's books and records do not delineate the precise amount claimed to have been paid to each of the individuals in each year, the precise nature of the services, or the amount of time spent in performing the services. To some degree, Pike's work papers give a more detailed breakdown as to amounts, but it is obvious that these work papers are not sufficient evidence in and of themselves. However, some of the testimony generally indicated the type of services performed and provided us with a basis for approximating the amounts properly deductible as ordinary and necessary business expense. We recognize that the amounts set forth in our findings of fact in each year are only an approximation. In reaching that approximation, we have taken several factors into consideration. Where petitioner's evidence of a claimed expense consisted only of a notation on Pike's work papers indicating that a specified sum was paid in cash to unspecified payees, we have allowed only a small portion of the amount claimed. The greater the specificity of the evidence, the more we have allowed, unless the evidence indicated that the services performed were not business-related. Included *83 in the amounts claimed herein is the salary of Maude Dent, petitioner's full-time maid. We have determined that, while a portion of her duties was related to petitioner's business, a major portion of her duties was of a non-business-related nature. In regard to the amounts purportedly paid to petitioner's sons, we accept petitioner's testimony as to the general nature of the services performed. However, there is no evidence to indicate the rate of compensation or the total amount of time spent by Thomas and Ray in performing these Services. Moreover, many of the services were primarily of a personal nature and the compensation, therefore, is not deductible. Thus, the amounts paid by petitioner to his sons for transporting him between his 1188 home and the hospital are not ordinary and necessary business expenditures but rather are commuting expenses. Margaret Galotta Sheldon, 50 T.C. 24 (1968); see Steinhort v. Commissioner, 335 F. 2d 496, 503 (C.A. 5, 1964). In determining the amounts allowed under this category, we have given recognition to the fact that the sons performed some services in connection with the maintenance of the PT Boat and the fact *84 that we have elsewhere determined the extent to which the boat was used for business purposes. [2]
The evidence regarding the services performed by Lucille and C. J. Biggs, while supporting a deduction for a portion of the amounts paid to them, does not justify deducting the substantial sums claimed. There is no evidence to indicate the nature of any services performed by Beverly. Included in the amount claimed under the category of secretarial and other services for the year 1955 was $1,287.39 paid to Dr. E. Deane Elsea, an associate of petitioner. While the evidence in regard to this item is meager, it is clear that Dr. Elsea was an associate of petitioner. There would appear to be no basis for finding this sum to be a loan and we have accordingly allowed this deduction in toto. A final factor we have taken into account with respect to the payments to members of petitioner's family is that frequently the purported compensation was paid in a lump sum at Christmas. These payments thus more closely resemble gifts than compensation. Entertainment *85 and Promotion Findings of Fact The amounts involved under this category are as follows: Year
Claimed by
Allowed by
Total amount
Amount at
Additional
petitioners
respondent
at issue
issue claimed
amount
to have been
allowed
paid in cash
herein
1950
$ 8,144.06
$1,200
$ 6,944.06
$ 4,218.09
$3,500
1951
13,712.49
1,200
12,512.49
8,850.00
4,300
1952
17,680.64
1,200
16,480.64
12,578.86
4,1 00
1953
6,277.89
1,200
5,077.89
3,000.00
3,425
1954
7,222.77
1,200
6,022.77
3,108.71
3,475
1955
12,966.52
1, 200
11,766.52
6,023.00
3,450
1956
31,777.12
1,200
30,577.12
3,235.66
3,425
1957
16,707.96
1,200
15,507.96
6, 034.00
3,400
1959
22,192.11
2,000
20,192.11
2,400.00
3,700
1960
8,841.83
1,000
7,841.83
0
4,400
1961
18,918.65
2,000
16,918.65
0
5,850
The amounts at issue include boat expenses, various club dues and expenses gifts, expenditures at hotels and restaurants, and certain travel as well as other miscellaneous items. Also in 1956, $16,475 was claimed as rent paid to Hamilton for an apartment in Florida. In certain other years rent for this cottage was claimed under *86 the separate category of Rent. A substantial portion of the amounts claimed was paid by checks. Respondent has conceded that these amounts were in fact paid but not that they were ordinary and necessary business expenses. The balance of the amounts at issue are claimed to have been spent in cash. The boat expenses related to a converted war surplus PT Boat purchased by petitioner in 1946 or 1947 and donated to the St. Peter's Home for Boys in 1960. It was 34 feet, 8 inches long, had a 600-horsepower motor, and was capable of running at 50 to 55 miles per hour. Prior to purchasing the PT Boat, petitioner had owned a considerably slower boat. A principal factor in petitioner's decision to buy the PT Boat was its speed capability, which enabled petitioner to travel farther in a shorter period of time. The club dues and expenses were paid to the Huron River Hunting and Trading Club, the Detroit Yacht Club, and the Detroit Golf Club. Petitioner indulged in frequent and lavish entertainment. The people for whom entertainment expenditures were deducted sometimes included patients (actual and potential), referring doctors, nurses, and interns. The people entertained were often personal *87 1189 friends as well as business associates. When entertaining, petitioner preferred to pay in cash because he found that this manner of paying was more likely to impress people. Frequently when entertaining, petitioner would arrive late and, after arriving at an affair, he frequently fell asleep. Thus, much of the burden of the entertainment was borne by Joan. Periodically, particularly around Christmas, petitioner gave cash gifts to various people who assisted him around the hospital, including nurses, interns, and orderlies. Travel expenses were claimed in certain years under this category. In other years travel was claimed under a separate category of Travel. In some years, it was claimed under both categories. Opinion Our findings of fact set forth the additional amounts we have found to be properly deductible. We need only comment on certain general factors which we took into account. Respondent relies excessively on the claim that petitioner's busy schedule and his success as a surgeon precluded both the opportunity and the need for other than minimal entertaining. He overlooks the fact that petitioner candidly admitted that he was often late in arriving at entertainment *88 functions and that he was prone to fall asleep at such functions, with the result that Joan carried much of the burden of the entertainment. He similarly overlooks the fact that petitioner had sufficient drive and energy to enable him both to live and work hard. On the other hand, petitioner labors under the misapprehension that any time he entertained a friend, who happened to be a business associate, the cost of the entertainment was properly deductible as a business expense. Merely because petitioner entertained patients, referring doctors, nurses, or interns does not mean that all such entertainment is an ordinary and necessary business expense as petitioner seemingly contends. In determining the precise amounts to be allowed as deductions for entertainment, we cannot view the category of Entertainment and Promotion in isolation. The amounts allowed under our findings of fact are in addition to the amounts we have allowed under other categories which relate in whole or in part to entertainment, such as Maude Dent's and petitioner's sons' salaries, claimed under Secretarial and Other Services and Salaries, Depreciation (Boat), Flowers, Rent (paid on the Florida apartment), Travel, *89 and Miscellaneous. We have taken these other amounts into account and have also given due regard to the amounts already allowed by respondent under the within category. Flowers Findings of Fact During the years at issue, petitioner frequently purchased flowers, either to be sent to certain physicians, patients, and friends on appropriate occasions or to be used when petitioner entertained while in his home. The amounts involved in this category are as follows: Year
Amount
Amount allowed
Amount still
Additional
claimed
by respondent
at issue
amount allowed
herein
1950
$481.42
$ 81.42
$400.00
$150
1951
499.74
99.74
400.00
150
1952
468.54
100.00
368.54
125
1953
63 0.06
100.00
530.06
200
1954
525.87
100.00
425.87
150
1955
610.31
110.31
500.00
200
1956
582.80
82.80
500.00
200
1957
643.93
93.93
550.00
225
Opinion During the years 1950 to 1957 petitioner claimed deductions for Flowers in addition to the deductions claimed for Entertainment and Promotion. During 1959 to 1961, the deduction for Flowers was included in the category of Entertainment and Promotion. The testimony as to this category *90 of deduction was extremely general. Our findings of fact show the additional amounts which we have allowed as an ordinary and necessary business expense. In making our determinations in this regard, we have taken into consideration the size of the total amounts claimed and the extensive nature of petitioner's practice. 1190 Depreciation (Boat) Findings of Fact Petitioner purchased a PT Boat in 1946 or 1947. The original cost, including the cost of converting the boat, was $16,000. Petitioner determined a 10-year useful life and claimed straight line depreciation. For each of the years 1950 through 1957, petitioner claimed depreciation of $1,600 on his converted PT Boat. Respondent disallowed the depreciation in its entirety on the ground that the use of the boat was purely personal. The boat was used both for the purpose of business entertainment and for petitioner's personal pleasure. Ten percent of the amount claimed for depreciation of the boat each yeaer was an ordinary and necessary business expense. Opinion Our findings of fact reflect all the essential elements with respect to this issue. Cf. Richard A. Sutter, 21 T.C. 170 (1953). See also *91 Entertainment and Promotion, p. 20, supra. Travel Findings of Fact Respondent disallowed all expenses claimed for travel as follows: Year
Amount Claimed
1952
$ 892.29
1953
7,828.88
1954
6,369.06
1955
7,044.63
1956
3,122.38
1957
4,661.38
1959
2,983.83
Petitioner traveled extensively, principally to attend professional conventions and to observe surgery by noted surgeons. Other trips included vacations and travel in connection with the criminal tax evasion charge. Joan accompanied petitioner on most of his trips. Petitioner's records in regard to travel are meager. Most of the amounts claimed represent estimates of cash amounts spent. Petitioner's travel to conventions and to observe surgery was an ordinary and necessary business expense, but Joan's expenses were not ordinary and necessary. The following table represents the amounts which were ordinary and necessary travel expenditures: Year
Amount
1952
$ 475
1953
2,100
1954
1,750
1955
1,775
1956
1,075
1957
1,425
1959
1,500 Opinion Petitioners claimed substantial travel expenditures during the years 1952 to 1957 and 1959 under the category of travel. Additional *92 travel expenses for these years and the other years involved herein have been dealt with under the category of Entertainment and Promotion. See p. 20, supra. As we have indicated in our findings of fact, only certain of the expenses claimed under the category of travel were ordinary and necessary. We are satisfied that petitioner traveled considerably to attend conventions or to observe surgery and that such travel was proximately related to petitioner's business. Petitioner was much too busy a surgeon to waste time on such trips unless they would be beneficial to his profession. However, the record indicates that certain of the amounts claimed represented Joan's expenses. Absent proof of the business nature of her presence, her expenses are not deductible. The record indicates that some portion of the trips was in connection with the criminal tax evasion charges. Even assuming that the litigation expenses in connection with this charge would be deductible (p. 68, infra, and cf. p. 78, infra), petitioner has not shown how, if at all, these trips were in any way proximately related to the charges or legal proceedings involved or how much was expended for such trips. He has therefore *93 not carried his burden of proof on these items. Some portion of the claimed travel expenses represented vacations and was clearly nondeductible personal expense. In determining the allowable amounts to be deducted, we have, as in the other items at issue, again given greater weight to the substantiated expenditures and the least weight to the unsubstantiated estimates of cash expenditures. Repairs and Maintenance Findings of Fact Petitioner claimed and respondent disallowed deductions under the category of repairs and maintenance (referred case income) as follows: 1191 Year
Amount Claimed
Amount Allowed
Amount Still
by Respondent
In Issue
1951
$1,287.64
0
$1,28 7.64
1952
3,472.76
$1,825.91
1,646.85
The amounts claimed above are in addition to amounts claimed by petitioner for repairs and maintenance under Income from Clinic. [3] Opinion The parties have stipulated that the claimed amounts were spent. The revenue agent's report for 1952 details the respective payees. However, there is no evidence whatsoever as to the purpose of these expenditures. The record does not indicate what was repaired *94 or maintained. Perhaps it was petitioners' apartment in Florida which was the beneficiary of the claimed expenditures, or perhaps the amount was spent on petitioner's home. In short, the record is totally barren of any evidence to support the deduction. To apply the Cohan rule under these circumstances would emasculate the general rule that petitioner has the burden of proof and we have accordingly denied any deduction beyond that already allowed by respondent. Auto Expenses and Depreciation (Auto) Findings of Fact Deductions under this category were claimed and allowed as follows: Auto Expenses
Year
Amount Claimed
Amount Allowed
Amount Still
by Respondent
At Issue
1950
$1,545.37
$ 780.00
$ 765.37
1951
2,115.55
780.00
1,335.55
1952
2,251.69
780.00
1,471.69
1953
2,664.14
7 80.00
1,884.14
1954
2,832.34
780.00
2,052.34
1955
2,910.76
780.00
2,130.76
1956
3,669.25
780.00
2,889.25
1957
3,737.75
780.00
2,957.75
1959
2,787.25
830.00
1,957.25
1960
1,647.67
1,127.28
520.39
1961
946.99
710.24
236.75
Depreciation (Auto)
1950
$1,163.57
$1,163.57
0
1951
1,725.59
570.32
$1,155.27
1952
1,977.38
1,225.01
752.37
1953
2,178.38
1,431.66
746.72
1954
2,749.75
1,601.32
1 ,148.43
1955
3,791.69
1,627.70
2,163.99
1956
4,145.28
2,694.47
1,450.81
1957
3,351.83
2,808.00
543.83
1959
3,304.84
1,789.18
1,515.66
1960
2,366.93
646.00
1,720.93
1961
750.00
750.00
0
*95 The claimed deductions were generally based on 100 percent business use of petitioner's car and Joan's car and 50 percent business use for Ray's car. Petitioner used his car primarily for business purposes, the principal nonbusiness use being commuting between his home and his office at the Highland Clinic. The major business use of the car was in traveling around to the many hospitals in which he operated. Joan used her car for both personal and business reasons. The major business use of the car was in connection with the affairs of Hamilton Corporation. Ray used his own car in part to run errands for petitioner. A portion of Ray's use of the car was on behalf of petitioner's business. The balance of the use of Ray's car was for personal driving. Opinion The evidence offered by petitioner was meager, lacking in specificity, and thus insufficient to rebut the correctness of respondent's determination. In point of fact, on the basis of the record herein, the amounts allowed by respondent appear quite reasonable. While these amounts may seem low for certain years in comparison with amounts allowed for the other years, petitioner has offered no proof related to any particular *96 year. Moreover, to the extent that the expenses of Joan's car were in furtherance of the business of Hamilton, they are not deductible by petitioners. Under all the circumstances, we are therefore unwilling to allow any auto expenses or depreciation in excess of the amounts allowed by respondent. Telephone and Telegraph Findings of Fact During the years in question petitioner made frequent use of pay telephones. Frequently he would emerge from the surgery room of the hospital to find several phone messages. Rather than trying to use the hospital phone or taking the time to return to his office to use his phone there, petitioner would use a convenient pay phone. Occasionally the calls he would have to make would be long distance calls. Also during the years in question an average of 15 business phone calls per day would be received at his home phone. Deductions for telephone and telegraph were claimed and allowed as follows: 1192 Year
Amount Claimed
Amount Allowed
Amount Still
by Respondent
At Issue
1950
$1,082.28
$ 402.28
$ 680.00
1951
1,177.10
497.10
680.00
1952
2,040.59
1,490.59
550.00
1953
2,649.48
1,899.48
750.00
1954
2,871.06
2,121.06
750.00
1955
2,924.32
2,050.32
874.00
1956
3,286.75
2,436.75
850.00
1957
3,330.75
1,468.96
1,861.79
1959
2,517.08
1,665.21
851.87
1960
2,563.73
1,823.06
740.67
1961
2,462.58
2,021.16
441.42
*97 For the years 1950 through 1956, respondent allowed all the phone expenditures claimed by petitioner which were verified by check and in addition allowed $50 of the claimed cash expenditures. The amounts at issue for 1950 through 1956 represent purported cash expenditures in excess of $50. For the year 1957, respondent followed essentially the same pattern except that, in addition to disallowing $750 representing the claimed cash expenditures in excess of $50, respondent also disallowed claimed phone expenditures as follows: Home phone
$ 382.50
West Branch Michigan phone
83.21
Unidentified phone
523.85
Additional overstatement due to alleged error by petitioner
122.23
$1,111.79 Respondent now concedes that the entire $1,111.79 was paid as phone expenditures but contends that petitioner has not shown these expenditures to be ordinary and necessary. For the years 1959 through 1961, petitioner claimed expenses for his office phone and for a home phone. Respondent allowed all of the expenses for the office phone and $300 for the home phone, disallowing the claimed expenses for the home phone in excess of $300. In addition to the amounts allowed by respondent *98 for the years 1950 through 1957, $315 for each year constitutes an ordinary and necessary expense. Opinion Petitioner's testimony convinced us that he made frequent daily use of pay telephones for business purposes. Accordingly, we have determined that he spent $315 per year for 1950 through 1957 in cash for telephone and telegraph (in addition to the $50 allowed by respondent for such expenditures). With respect to the remaining amounts of claimed expenditures for telephone in connection with petitioner's business, the record is devoid of any evidence with respect to the specific items in 1957 or the allocation of telephone expenditures between business and personal use for the years 1959 through 1961. Accordingly, we sustain respondent's determinations. Depreciation (X-Ray) Findings of Fact In 1957 petitioners claimed depreciation of $3,350 on certain X-ray equipment. Respondent disallowed the entire amount. The equipment was acquired in the latter part of December 1957 for a total cost of $6,700. Opinion Respondent disallowed the entire amount of depreciation claimed by petitioner in 1957 for certain X-ray equipment on the ground that the equipment was not acquired *99 until the latter part of December 1957. Petitioner has offered no proof with respect to the acquisition date or the date the equipment was put into use except for two checks apparently in payment for the equipment. The first check is for $100 and is dated December 20, 1967. The second is for $6,600 and is dated December 29, 1967. These checks reinforce respondent's position. Petitioner makes no argument that depreciation should be allowed in a later year; nor is there any evidence to support a finding that the equipment was in use after 1958 (a year not before us) which would support a depreciation allowance. Surgical Supplies Findings of Fact From time to time, petitioner would expend sums in cash for surgical supplies. When traveling he would visit different surgical supply stores, buying items for cash. The amounts involved in this category are as follows: Year
Amount
Amount Allowed
Amount Still
Additional Amount
Claimed
by Respondent
At Issue
Allowed Herein
1950
$6,423.23
$2,103.23
$4,320.00
$950.00
1951
3,521.25
3,521.25
0
0
1952
7,153.95
7,153.95
0
0
1953
2,444.11
1,944.11
500.00
375.00
1954
2,848.87
2,348.87
500.00
375.00
1955
4,487.98
2,115.55
2,372.43
775.00
1956
4,591.11
3,643.28
947 .83
600.00
1957
4,740.96
3,011.72
1,729.24
700.00
1959
195.00
195.00
0
0
1960
2,354.99
2,354.99
0
0
1961
2,358.69
2,358.69
0
0
*100 Opinion
The only sums remaining at issue are amounts which petitioner purportedly paid in cash or sums for which he has no written verification of the expenditure. Respondent concedes that all sums proven to have been spent for surgical supplies are ordinary and necessary business expenses. He makes no claim that any such sums should be capitalized.
Petitioner testified at length with respect to his frequent expenditures of large sums of cash for surgical supplies, often during the course of his travels. No evidence other than this oral testimony was presented. One would normally expect that such purchases, particularly in view of the large amounts involved herein, would have been paid for by check or that petitioner would at least have obtained and kept a receipt or other written evidence thereof. We note also that the year where the largest sum is at issue for surgical supplies is 1950, a year in which petitioner apparently claimed only minimal travel expenditures.
We are satisfied, as our findings of fact reflect, that petitioner expended some amounts for surgical supplies beyond those allowed by respondent.
Insurance Findings of Fact
Deductions for insurance under referred *101 case income were claimed and allowed as follows: Amount
Amount allowed
Amount still
Year
claimed
by respondent
at issue
1953
$1,497.56
$1,197.78
$299.78
1955
1,104.66
362.98
741.68
1956
654.03
312.00
342.03
1957
941.10
832.25
108.85
1959
1,024.44
707.19
317.25
1961
1,245.38
1,129.38
116.00
The amounts at issue in 1953 and 1959, as well as $250.80 of the amount at issue in 1955, constituted insurance expenditures for the PT Boat. Ten percent of these amounts constitute ordinary and necessary business expenses. In 1961, the amount disallowed by respondent represented a portion of the insurance expenditures on two automobiles. Opinion Respondent allowed a substantial portion of the amounts claimed by petitioner for insurance, including the entire amounts in 1950 through 1952 and 1954. Respondent now concedes that the disallowed amounts were paid for insurance but maintains that petitioner has failed to prove the necessary business purpose for the insurance. The available evidence as to the precise nature of the insurance expenditures is extremely meager. Our findings of fact show that a portion of these expenditures was for *102 insurance on the PT Boat. In accordance with our treatment of the other expenses relating to the PT Boat, we have allowed ten percent of these amounts. [4] As to the year 1961, we have no evidence upon which to make a determination as to the business use of the two automobiles. Therefore, respondent's determination is sustained. There is no evidence to indicate the nature of the balance of the insurance expenses at issue. Accordingly, respondent's determination as to these amounts is sustained. Laundry and Linen Findings of Fact In 1955 petitioner claimed $871.39 as a deduction for laundry and linen. Respondent disallowed $563.50 of the amount claimed. Petitioner spent $871.39 for laundry and linen in 1955, all of which is an ordinary and necessary business expense. 1194 Opinion The total amount claimed by petitioner in 1955 for laundry and linen is consistent with amounts claimed by petitioner in other years and allowed in full by respondent. The amount claimed in 1955 is reflected in Pike's work papers. Moreover, petitioner's testimony amply substantiates his need for substantial laundry and linen expenses. Accordingly, *103 the entire amount is allowed. Office Supplies and Expenses Findings of Fact Deductions for office supplies and expenses were claimed and allowed as follows: Additional
Amount
Amount allowed
Amount still
amount allowed
Year
claimed
by respondent
at issue
herein
1953
$2,026.77
$1,376.77
$ 650.00
$275
1954
2,166.72
1,516.72
650.00
275
1955
2,045.60
1,665.20
380.40
200
1956
2,056.09
596.52
1,459.57
650
1957
3,189.81
352.04
2,837.77
700
Petitioner also claimed $265.22, $1,097.02, $2,447.26, and $1,563.58 as deductions for office expenses in 1950, 1959, 1960, and 1961, respectively, which respondent allowed in full. In addition, petitioner claimed comparable deductions in 1951 and 1952 which are at issue under Income from Clinic. [5] The amount at issue in 1956 includes a check for $100 paid to the Emerald Ball Committee. The amount at issue in 1957 includes a check for $681.25, dated December 26, 1957, for a typewriter and a check for $352.05 representing an expenditure for cleaning and repair of drapes. The typewriter expense is a capital expenditure. The expenditure *104 for cleaning and repair of drapes was allowed under Repairs and Maintenance. See p. 58, infra. The balance of the amounts at issue represents sums which petitioner claims to have spent in cash or other sums for which there is no written verification of the expenditure. The amount claimed in 1956 includes $100 paid to the Emerald Ball Committee, which appears to have been a political function. Opinion The amount claimed in 1957 includes $681.25 paid in the latter part of December for a typewriter. Respondent properly determined that the cost of the typewriter was a capital expenditure and thus not deductible. See Citizens Trust Co. of Utica, 2 B.T.A. 1239 (1925); Louis Titus, 2 B.T.A. 754 (1925). Petitioner's cost is properly deductible only through depreciation. Petitioner has not claimed depreciation for 1959, 1960, and 1961 and he has failed to prove that it would be allowable for those years. For aught that appears on the record, petitioner may have sold the typewriter in 1958, a year not at issue herein. Accordingly, petitioner is not entitled to any deduction. The balance of the amounts claimed represents cash items or amounts unverified *105 by checks. We have, after consideration of all the evidence, determined the additional amounts allowable and they are reflected in our findings of fact. Also included in the amount claimed for 1957 was a check for $352.05 which had already been allowed once by respondent under the category of Repair and Maintenance, according to the revenue agent's report. Moreover, we note that Pike's work papers for 1957 show $352.05 as one of the amounts making up the total deduction for repairs and maintenance. Accordingly, we sustain respondent's disallowance of this item under this category. Dues and Subscriptions Findings of Fact Petitioners claimed and respondent allowed deductions for dues and subscriptions as follows: Year
Amount claimed
Amount allowed
Amount still
by respondent
at issue
1950
$ 6,838.70
$283.70
$ 6,555
1951
3,518.13
518.13
3,000
1952
9,625.28
625.28
9,000
1953
11,491.90
621.90
10,870
1954
20,024.70
449.70
19,575
1955
28,810.00
460.00
28,350
1956
10,722.72
701.72
10,021
1957
5,556.00
530.00
5,026 1195 The amounts allowed by respondent represent dues to various professional associations of which petitioner *106 was a member. The amounts disallowed by respondent represent payments made by petitioner with respect to the Detroit Osteopathic Hospital staff assessment loan programs. [6] In 1956, the amounts paid by petitioner exceeded the amounts claimed by $2,670. Under the loan programs, petitioner was required to pay the hospital a bed assessment of $5.00 for cash patients of his entered in the hospital. In exchange for the payments, petitioner received interest-bearing notes from the hospital in the amount of his payments. Petitioner, because he felt there was a possibility the notes would go unpaid and because he felt he could not loan such substantial sums to the hospital and, at the same time, pay taxes on these amounts, determined that he would deduct the loan payments on his tax return as a business expense. Petitioner from time to time waived his right to all interest payments on the notes. Petitioner never relinquished the right to be reimbursed for the principal on the loans. At *107 no time have the notes become worthless. Petitioner was subsequently repaid for the amounts loaned to the hospital in the years 1950 to 1957. Opinion During the years in question, petitioner made substantial payments to the Detroit Osteopathic Hospital with respect to its staff assessment loan programs and received notes therefor. Petitioner testified that he felt that there was a possibility that the notes would not be paid, that he could not afford to pay the tax on his full income while at the same time loaning substantial sums to the hospital, and that he therefore determined to deduct the amounts loaned to the hospital. At this point petitioner's position becomes cloudy. He states that he told the hospital he did not expect repayment, yet, in later years, after he became concerned that respondent would not permit the deductions, he secured repayment of the loans. It appears that he waived only the interest on the notes. We can understand petitioner's cash flow problem, but the fact remains that, in exchange for the cash loaned to the hospital, petitioner received valuable property in the form of notes. For aught that appears on the record, petitioner could either have *108 borrowed money on these notes or sold them to a willing buyer. Neither the difficulties in finding the cash to pay his income tax on the equivalent amount of income nor his subjective doubts as to the possibility of payment justify petitioner's determination that the payments were deductible. Wells-Lee v. Commissioner, 360 F. 2d 665 (C.A. 8, 1966), affirming in part and reversing in part a Memorandum Opinion of this Court, and Charles J. Dinardo, 22 T.C. 430 (1954), cited by petitioners, do not support this position. Neither case involved a right of repayment in the taxpayer. Compare also Walters v. Commissioner, 383 F. 2d 922 (C.A. 6, 1967). Hospital Fees and Expenses Findings of Fact Deductions for hospital fees and expenses are as follows:
Year
Amount claimed
Amount allowed
Amount still
Additional
by respondent
at issue
amount allowed
herein
1950
$2,780.80
$ 275.00
$2,505.80
$ 475
1951
3,147.08
593.76
2,553.32
200
1952
1,478.37
165.00
1,313.37
375
1953
1,545.79
100.00
1,445.79
500
1954
5,765 .43
49.51
5,715.92
250
1955
2,853.99
0
2,853.99
250
1956
3,074.38
158.83
2,915.55
650
1957
2,557.76
119.31
2,438.45
650
1959
1,962.26
1,962.26
0
800
1960
3,063.02
0
3,063.02
0
1961
413.07
0
413.07
0
*109 1196 During the years in question, petitioner claimed deductions for purchase and cleaning of special shoes used only in the hospitals, for payment to nurses for overtime work necessitated by his long hours of surgery, for small cash gifts, usually at Christmas, paid to various assistants around the hospital such as nurses, secretaries, interns, and externs. All of these payments are ordinary and necessary business expenditures. Also claimed under the category of Hospital Fees and Expenses were payments to the Detroit Osteopathic Hospital which respondent disallowed. These payments were for the staff assessment loan programs [7] and for meals eaten at the hospital by petitioner. In addition, in 1951, petitioner paid claimed deductions for payments under the staff assessment loan program at Ziegler and Cadieux Hospitals. These programs were similar to those at Detroit Osteopathic Hospital. Opinion Of the various expenses claimed hereunder, the payments under the Detroit Osteopathic Hospital's staff assessment loan program are clearly unallowable for the reasons stated under *110 the heading Dues and Subscriptions. See p. 39, supra. Similar treatment must be accorded to the payments under the staff assessment loan programs of two other hospitals. There is no evidence as to the manner in which these assessments were determined or the circumstances of payment. For aught that appears, petitioner may have received notes in exchange in the same fashion as in the case of the Detoit Osteopathic Hospital. Some of the payments to the Detroit Osteopathic Hospital represented the cost of meals eaten there by petitioner. We have been furnished with no basis for determining that the amounts constituted other than personal expenses. Accordingly, respondent's determination with respect to these payments is sustained. Finally, petitioner claimed deductions for the purchase and cleaning of special shose worn only at the hospitals, for special payments to nurses, and for many small cash gifts to various assistants at the hospital. To the extent that these payments represented actual expenditures, they are ordinary and necessary business expenses and thus deductible, and we have so found. It is abundantly clear that the amounts claimed were, for the most part, paid in cash *111 and that, other than petitioner's general statements as to the purpose of the expenditures, there were no supporting records or testimony as to how much was paid and when. We also note the overlap of these expenses with similar expenses claimed under other categories including Entertainment and Promotion, Laundry and Linen, Office Supplies and Expenses. The allowable amounts are set forth in our findings of fact. Refunds to Patients Findings of Fact In 1961, petitioner claimed a deduction of $4,820.53 for Refunds to Patients. Respondent disallowed $2,067.58 of this amount, consisting of $1,867.58, claimed to be a refund of business activity taxes paid by petitioner in 1957, 1958, and 1959 and deducted in those years, and a check for $200 payable to the National Association of Letter Carriers, which was deposited in the hospital reserve account of the association. Opinion Only two checks in the year 1961 are at issue under this category. Petitioner adduced no testimony at trial with respect to these checks, although he attempted to remedy this failure on brief by adding facts not otherwise in the record. The first check is claimed to represent a refund to petitioner of *112 a business activity tax for prior years. It is difficult, under any circumstances, to see how a refund could constitute a deduction. On brief, petitioner states that this amount is deductible because the refund was included in income in 1961. Even assuming this statement to be true, petitioner must still fail. For aught that appears on the record, petitioner had the benefit of deductions for these taxes in the years paid. Accordingly, he would be required to include the refund in 1961 income. The second check, for $200, was payable to the National Association of Letter Carriers. Respondent's revenue agent's report indicates that the check was deposited in the hospital reserve account of the association. Deduction was denied for lack of substantiation. No further evidence appears 1197 in the record. However, petitioner states on brief that the check represented a refund of a duplicate payment with respect to one Carol Cousineau and "was therefore a proper deduction inasmuch as said amount was reflected in the gross receipts and should only be taxed once." (Emphasis added.) Petitioner's theory is undoubtedly correct. The difficulty is that he has failed to prove that "said amount *113 was reflected in the gross receipts." Nor can we assume that petitioner's books - so frequently shown to have been lacking in care - did in fact include both payments in income. Accordingly, respondent's determination is sustained. Paid to Dr. Harold Jones Findings of Fact Dr. Harold Jones worked closely with petitioner in his surgical practice commencing in 1951 and was petitioner's chief assistant. Deductions for amounts paid to him were claimed and allowed as follows: Year
Amount claimed
Amount allowed
Amount still
Additional
by respondent
at issue
amount allowed
herein
1951
$14,200.00
$ 9,700.00
$4,500.00
$ 4,500.00
1953
37,873.75
35,573.33
2,300.42
2,300.42
1956
65,444.75
63,439.48
2,005.27
2,005.27
Petitioner also claimed deductions for amounts paid to Dr. Jones in other years which respondent has allowed in full as follows: Year
Amount
1952
$31,650.00
1954
51,855.40
1955
53,003.22
1957
74,527.90
1959
83,813.81
1960
89,349.00
Opinion Commencing in 1951, Dr. Harold Jones was petitioner's chief associate at the Highland Avenue Clinic. Respondent concedes that amounts in fact paid *114 by petitioner to Dr. Jones would be deductible. The evidence herein is meager and not altogether satisfactory, consisting merely of a statement by petitioner that a portion of the disallowed amounts constituted a yearend bonus and his general assertion that if the amounts involved were claimed as deductions, they were paid. On the other hand, the total amounts claimed in the years in issue are not out of line with the amounts claimed and allowed in full in other years. On the whole, we are satisfied that the full amounts claimed were paid to Dr. Jones. Accordingly, in view of respondent's concession, they are deductible and we have so found. Paid to Other Doctors Findings of Fact Deductions under this category [8] were claimed and allowed as follows: Year
Amount claimed
Amount allowed
Amount still at
Additional amount
by respondent
issue
allowed herein
1952
$ 2,350.00
$ 1,343.52
$ 1,006.48
$ 1,006.48
1953
7,023.66
0
7,023.66
0
1954
10,520.00
0
10,520.00
10,520.00
1955
6,265.33
684.74
5,580.59
4,600.00
1956
11,801.60
0
11,801.60
5,340.00
1957
5,119.50
0
5,119.50
0
1961 [9]
287,674.78
281,574.78
6,100.00
0
*115 For 1952, petitioner paid $1,500 to a Dr. Haight and $850 to a Dr. Hamburger as fees for referral and professional assistance. These amounts aggregating $2,350 constitute ordinary and necessary business expense. For 1954, petitioner paid $5,520 to the Gratiot Clinic for post-operative care provided by the Clinic to his patients and $5,000 to a Dr. I. L. O'Connor for consultation on obstetrical and GYN cases 1198 during the year. These amounts aggregating $10,520 constitute ordinary and necessary business expenses. For 1955, petitioner concedes that $500 of the amount claimed and disallowed was a loan to one Dr. Siefkes. Of the remaining $5,080 disallowed, $4,600 was paid to the Gratiot Clinic for post-operative care rendered to petitioner's patients and constitutes an ordinary and necessary business expense. For 1956, petitioner concedes that $5,000 of the amount claimed and disallowed represented loans to three doctors. He also paid $500 *116 to a Dr. Vos as a down payment on a building subsequently purchased by Hamilton. Petitioner paid $4,320 to a Dr. Floyd Jones and $1,020 to Dr. E. Deane Elsea, both of whom were associates of petitioner, for professional services rendered to petitioner in connection with his medical practice. These amounts, aggregating $5,340, constitute ordinary and necessary business expense. In 1961, the amount petitioner deducted included $6,100 paid to Dr. H. Jones. Respondent disallowed this deduction on the ground that it was claimed in 1960 as well. Opinion Respondent has disallowed a major portion of the amounts claimed under this category for lack of verification as to expenditure and purpose. A principal weapon in respondent's arsenal is the concession by petitioner that in 1955 a loan of $500 was erroneously deducted under this category and in 1956 loans to three doctors of $5,000 were similarly deducted. From this, respondent concludes that all the other amounts involved may well have been loans. On the other hand, petitioner readily conceded the errors and testified that these items were inadvertently deducted and that he was sure no other loans were similarly deducted. We are *117 satisfied that some of the amounts involved were expended for business purposes and, where there was direct supporting testimony, we have allowed these amounts in full. As to the balance of the amounts (including all amounts at issue for 1953 and 1957), we have not allowed any portion thereof for the reason that there was no specific testimony with respect thereto and not even Pike's work papers provide any basis upon which some identification might be made. With respect to the amounts allowed for payments to the Gratiot Clinic in 1954 and 1955, we note, not only that they were payments for services rendered, but that a portion of the income of the Clinic has been stipulated to be taxable to petitioner, with the result that the net reduction in petitioner's taxable income is less than the allowable deductions. As to 1955, the amount of $480.59 remaining disallowed apparently represents reimbursement of certain expenses to one of petitioner's associates. The revenue agent's report indicates that this amount may have been also deducted under Salaries. In view of the absence of any testimony or other evidence explaining this item, we must sustain respondent. The parties have stipulated *118 with respect to 1956 that petitioner paid Dr. Floyd Jones $4,320 and Dr. E. Deane Elsea $1,020. Petitioner testified that both men worked with him. We have decided, although petitioner's evidence in this regard is less than substantial, to allow these payments. With respect to the amount at issue in 1961, the revenue agent's report indicates that this amount was deducted and allowed in 1960 and thus, to prevent a double deduction, was disallowed in 1961. Petitioner has offered no evidence to rebut this determination. Respondent, accordingly, is sustained. Miscellaneous Findings of Fact Petitioners claimed and respondent allowed deductions under the category of Miscellaneous as follows: Year
Amount
Amount allowed
Amount still
claimed
by respondent
at issue
1950
$ 364.53
$ 122.29
$ 242.24
1951
1,728.23
1,005.74
722.49
1952
839.30
169.30
670.00
1953
990.0 0
11.00
979.00
1954
3,320.29
785.69
2,534.60
1956
639.93
343.62
296.31
1957
227.48
0
227.48
1960
3,314.45
0
3,314.45
The amounts at issue involve such items as payments to hotels, jewelry and gift shops, and other doctors, closing cost on the sale of the Plymouth *119 Road property, car rentals, and train fares. A substantial portion of the amounts disallowed represented purported cash expenditures. One item, i.e., a check to Dr. H. E. Jones in the amount of $643.14, was characterized by the revenue agent as a double deduction. 1199 Opinion Petitioner did not see fit to offer any specific testimony as to the amounts at issue under this category. The sole sources of the nature of the purported expenditures are the revenue agent's reports for the years in question. Many of the disallowed amounts are merely characterized as unsubstantiated expenditures. To the extent that the revenue agent was able to identify the amounts claimed, we have already allowed comparable deductions under the other categories. [10] With respect to the balance of the amounts at issue, we have no basis for determining allowable deductions. Accordingly, respondent's determination is sustained with respect to all amounts still at issue. *120 Taxes Findings of Fact In 1956, petitioner claimed a deduction for taxes in the amount of $805.31. Respondent has allowed $632.47 of the amount claimed, leaving $172.84 still at issue. The parties have stipulated that $110.82 of the amount at issue was paid to the internal revenue service. Opinion Respondent has disallowed $172.84 under this category for the year 1956. Except for a stipulation that $110.82 was paid to the internal revenue service and a general reference in the record to the fact that petitioner paid employment taxes with respect to Maude Dent, there is no evidence to indicate the nature of the claimed deduction. Even assuming these are employment taxes with respect to Maude Dent - which petitioner has failed to prove - the amount allowed as salary for her is sufficient in light of the services performed by her to make allowance for fringe expense such as Social Security taxes. [11] Respondent's disallowance is sustained. Income from Clinic Findings of Fact Petitioner reported the income from the Gratiot Clinic and the deductions therefrom on a separate schedule from *121 Referred Case Income during the years 1950 to 1952 and prior to the transfer of the Clinic to a partnership composed of petitioner's children. The deductions claimed under Income from Clinic during those years are generally broken down into the same categories as the Referred Case Income deductions. In 1950, petitioner paid $1,030 to the Detroit Osteopathic Hospital staff assessment loan program. In 1950, petitioner claimed a deduction for the amount of $1,187.60 purportedly paid to Dr. Folkman, a recent medical school graduate, who worked at the Clinic on a trial basis. The amount claimed was paid and constitutes an ordinary and necessary business expense. In 1951 and 1952, petitioner claimed deductions for office supplies and expenses of $1,505.38 and $848.65, respectively, of which respondent allowed $752.05 and $430.70, respectively. In addition to the amounts allowed by respondent, $275 and $250, respectively, were spent and constitute an ordinary and necessary business expense. In 1951, petitioner claimed a deduction for insurance of $688.23 represented by the three checks payable to petitioner's attorney, Clement J. Waldmann. Two of the checks bore a notation that they *122 were for attorney's fees. Respondent subsequently disallowed all but $91.35 of the amount claimed. The amount still at issue was paid for business insurance or for legal fees and constitutes an ordinary and necessary business expense. In 1951, petitioner claimed a deduction for payment to Outside Doctors in the amount of $3,752. Respondent disallowed $2,800, which purported to represent payments to a Dr. Dobritt. In 1951, petitioner claimed a deduction under the category of Paid to Other Doctors in the amount of $6,725.66, representing payments purportedly made to Doctors Folkman, Zielinski, and Dobritt, of which respondent allowed $1,944.60. In 1952, petitioner claimed a deduction of $5,915.69 for X-ray, EKG, Special Lab. & Physiotheraphy [sic], of which respondent allowed $1,359.69 and disallowed $4,556, represented by a check dated December 29, 1952, payable to "Osteopathic Lab.," a partnership among petitioner's four children. In 1950 and 1951, petitioner claimed deductions under this same category in 1200 the respective amounts of $1,549.95 and $1,188.29, all of which was allowed by respondent. In 1952, petitioner claimed a deduction of $1,484.20 for Repairs and *123 Maintenance, of which respondent allowed $361.28. In addition to the amount allowed by respondent, petitioner spent $225, which constituted an ordinary and necessary business expense. In 1952, petitioner claimed a deduction of $564.54 for Miscellaneous expenditures. Respondent disallowed $415 represented by two checks payable to R.A. Biggs. Opinion This category relates to various deductions claimed in arriving at the income of petitioner from the Gratiot Clinic for the years 1950 through 1952. The parties have agreed with respect to most of the claimed deductions. The items remaining at issue are dealt with below. In 1950, petitioner claimed a deduction for payments to the Detroit Osteopathic Hospital staff assessment loan program. As we indicated under Dues and Subscriptions, these amounts are loans and are thus not allowable as business expense deductions. [12]
In 1950, petitioner claimed a deduction for $1,187.60 purportedly paid to a Dr. Folkman. At trial, petitioner testified that Dr. Folkman worked at the Gratiot Clinic on a trial basis. Based on petitioner's testimony and the apparent reasonableness of the amount paid, we have *124 allowed that sum as an ordinary and necessary business expense. In both 1951 and 1952, petitioner claimed deductions for Office Supplies and Expenses. After examining all the evidence, we have determined, as our findings of fact show, additional allowable amounts. In 1951, petitioner claimed a deduction of $688.23 for Insurance which respondent's agent disallowed because the payee of the three checks was petitioner's attorney, Clement J. Waldmann, and because two of the three checks stated on their face that they were in payment of attorney's fees. By stipulation, respondent has now allowed $91.35 for Insurance. At trial, petitioner testified that the claimed Insurance expense related to the Gratiot building. Moreover, Waldmann testified that he procured insurance for petitioner's profession and provided legal services to petitioner, all of which were in connection with petitioner's medical practice. Accordingly, we have allowed the entire amount claimed for Insurance. In 1951, respondent disallowed $2,800 of $3,752 claimed under Outside Doctors. According to the revenue agent's report, the entire $2,800 was paid to a Dr. Dobritt. The parties have stipulated that the entire sum *125 was in fact paid. The only evidence offered by petitioner was general testimony that sums claimed under this category would have been paid to reference doctors. We were furnished no probative evidence as to the nature of Dobritt's services as we were in the case of certain other doctors. [13] In view of the round amount involved and the fact that, in other years, petitioner deducted loans paid to various doctors, we think it was incumbent on petitioner to offer more specific testimony. Accordingly, respondent's disallowance is sustained. In 1951, respondent's agent disallowed $6,725.66 claimed under Paid to Other Doctors, representing amounts purportedly paid to three doctors. Subsequently, by stipulation, respondent allowed $1,944.60, leaving $4,781.06 at issue. Here again, with the exception of Folkman, we were furnished with no probative evidence by testimony or otherwise as to the nature of the services. This is insufficient to substantiate any allowable amount in excess of the amount already allowed by respondent. [14]
*126 In 1952, respondent disallowed $4,556 of the amount claimed for X-ray, EKG, etc. The revenue agent's report indicates that the disallowed amount consisted of a single check payable to "Osteopathic Lab," a partnership, composed of petitioner's four children, which was not formed until January 14, 1953. Petitioner offered no explanation of this check. Moreover, we note that the amount allowed by respondent for 1952 is 1201 approximately the same size as the amounts claimed under this category in 1950 and 1951. Accordingly, respondent's disallowance of $4,556 is sustained. In 1952, respondent disallowed a portion of the amount claimed for Repairs and Maintenance. After considering all the evidence, we have determined an additional allowance, as indicated in our findings of fact. Finally, in 1952 petitioner claimed a deduction of $564.54 for Miscellaneous, of which respondent disallowed $415 on the ground that it consisted of two checks payable to R.A. Biggs. Petitioner offered no explanation with respect to these checks. Accordingly, respondent's determination is sustained. Loss from Gas Station Findings of Fact In 1950 petitioner claimed a loss of $2,485.97 under the *127 category of Loss from Gas Station which respondent disallowed in its entirety. Pike's work papers show gross sales by the gas station of $9,872.15, less cost of goods sold of $6,783.63, for a gross profit of $3,088.52. Fourteen various categories of purported expenses totaling $5,574.49 are indicated, including $1,019.48 in Miscellaneous expenses. Opinion Petitioner claimed a loss from the operation of a gas station. Pike's work papers show purported summaries of the income and expense items. The only other information in the record relating to this item is the very general testimony of petitioner, saying nothing more than that the gas station operated at a loss. No evidence was offered to substantiate the correctness of the various income and expense items. Merely because petitioner claimed Loss from Gas Station as a single category on his return does not relieve him of an obligation to provide some evidence as to the various items making up that category. Petitioner has clearly failed to satisfy his burden of proving error in respondent's disallowance of the loss. Accordingly, respondent's determination is sustained. Capital Loss on Sale of Gas Station Equipment Findings *128 of Fact In 1952, petitioner claimed a capital loss on the sale of certain gas station equipment, [15] based on a gross sales price of $1,200 and a cost of $4,637.59, less allowable depreciation of $1,727.38, for a net capital loss of $1,710.21. The parties have stipulated that the acquisition cost of the equipment was at least $2,006.82. Petitioner claimed $1,000 of this loss in 1952 and carried forward the balance of $710.21 to his 1953 return. Respondent disallowed the entire loss. Opinion In 1952, petitioner claimed a capital loss on the sale of gas station equipment. Respondent disallowed the loss because of petitioner's failure to verify it. The parties have stipulated that the acquisition cost of the equipment was at least $2,006.82. The parties additionally stipulated as follows: It is further stipulated and agreed that checks in the amount of $1,888.43 were expended to The Lowery Company during 1948. Said checks were cashed in West Branch and claimed as part of cost by petitioners. In addition, an amount of $797.38 unidentified *129 but listed on the West Branch Bank Statement during the year 1949 was expended. [Par. 55, Supp. Stip. No. 3.] Petitioner offered no explanation with respect to the checks issued to The Lowery Company or of the unidentified expenditure from which we might have determined that they further increased petitioner's cost basis for the equipment. The only information relating to the sale of the equipment is petitioner's income tax return showing the purported figures for gross sales price, cost, and allowed or allowable depreciation. Petitioner's tax return and the stipulation fall far short of being sufficient proof of an allowable loss. Accordingly, respondent's adjustment is sustained. [16]
Depreciation and *130 Repairs and Maintenance as Reflected in Understatement of Rental Income Findings of Fact Petitioners claimed and respondent disallowed depreciation with respect to the 1202 property owned by petitioner at 215 Highland Avenue, Detroit, as follows: Building
Year
Amount claimed
Amount allowed
Amount still at
by respondent
issue
1951
$11,680.00
0
$11,680.00
1952
11,680.00
$ 2,018.15
9,661.85
1953
11,680.00
1,693.66
9,986.34
1954
11,080.00
1,693.66
9,386.34
Furniture
and
Fixtures
Year
Amount claimed
Amount allowed
Amount still at
by respondent
issue
1951
$ 4,500.00
0
$ 4,500.00
1952
8,656.57
$ 1,635.98
7,020.59
1953
8,656.56
2,181.31
6,475.25
1955
29.79
0
29.79
1956
24.83
0
24.83
1957
20.06
0
20.06
Petitioner acquired a one-half interest in the site at 215 Highland Avenue in 1950 and the other 50 percent in 1951 for a total cost of $24,026.40. At the time the site was acquired, petitioner intended to tear down the entire building except two walls and to reconstruct a building to be used as a clinic. Of the original cost, $23,500 is allocable to the land. Construction of the rebuilt clinic was *131 completed in 1952 at an additional cost of $88,869.79, an increase in the amount upon which the depreciation calculations in the deficiency notice are based. The building was not available for use until the beginning of April 1952. The newly reconstructed building had a useful life of 40 years. In addition to the depreciation allowed by respondent in 1953 and 1954, an additional $541.25 for each year is an ordinary and necessary expense for depreciation with respect to the building. [17]
The total cost of the furniture and fixtures was $21,813.13, the figure upon which the depreciation calculations in the deficiency notice were based. None of the furniture and fixtures was put into use prior to April 1952. They had a useful life of 10 years. Early in 1955, petitioner transferred the property at 215 Highland Avenue and the furniture and fixtures to Hamilton Corporation in exchange for stock. Hamilton owned all furniture and fixtures for which petitioner claimed depreciation in 1955 *132 through 1957. Petitioner also claimed a deduction of $4,078.98 in 1954 for Repairs and Maintenance in connection with this property which respondent disallowed completely. In 1953, petitioner claimed $2,343.67 for Repairs and Maintenance which respondent allowed in its entirety. Petitioner paid $500 in 1954 for Repairs and Maintenance as an ordinary and necessary business expense. Opinion The items at issue under this category all relate to deductions for the builing or the furniture and fixtures at the clinic used by petitioner across from Detroit Osteopathic Hospital. We have found that petitioner acquired the site for $24,026.40 with the intent of demolishing all but a small portion of the building. Petitioner furnished no evidence to dispute respondent's allocation of $23,500 to the land and we have accordingly sustained his determination. There was originally some difference as to the cost of construction of the new building, but the parties are now in agreement that the proper amount is $88,869.79. This amount plus the $526.40 allocable part of the original cost, or a total of $89,396.19, is the cost basis for purposes of depreciation. This is in excess of the amount *133 used by respondent in determining the deficiencies herein. Petitioner made no use of the site prior to the completion of reconstruction in early April 1952. Nevertheless, he claimed depreciation on the site in 1951 equal to almost half the cost of the site, which respondent disallowed in its entirety. Petitioner did not provide us with any justification for depreciation on the building in 1951. Accordingly, we have sustained respondent's determination as to that year. Petitioner determined a useful life for the building of approximately 10 years and claimed depreciation accordingly. The only justification offered for this determination was certain statements in petitioner's brief that the building could be used only as an office for osteopaths; that the building was in a declining neighborhood; that it was known that Detroit Osteopathic Hospital would be built across the street; that, because of petitioner's poor health, he would only be able to use the building for 10 years; and, finally, that, because no other osteopath would use the site because of the reasons detailed 1203 above, the usefulness of the building would cease upon petitioner's retirement. There is not the slightest *134 evidence in the record to support these assertions, even assuming that, if proved, they would support any such period of useful life. Accordingly, petitioner has failed to prove error in respondent's determination of a useful life of 40 years. Subject to the foregoing, we have allowed depreciation on the building in excess of that allowed by respondent for the period April 1952 through December 1954 in order to reflect the cost figures for the building, all as determined in our findings of fact. The furniture and equipment were also not put into use until April 1952. Perhaps these items were in earlier use by petitioner at another location, but petitioner made no effort to enlighten us on this score. Under these circumstances, no depreciation is allowable for 1951 and the first three months of 1952. Respondent determined a useful life of 10 years. Petitioner has offered no proof of a contrary useful life. Accordingly, respondent's adjustments for 1951, 1952, and 1953 are sustained. With respect to the depreciation claimed on furniture and fixtures in 1955, 1956, and 1957, respondent's revenue agent's report states that the items were owned by Hamiltton Corporation, which also *135 claimed depreciation thereon. Petitioner has offered no evidence to the contrary. Accordingly, we have sustained respondent's determination. [18]
Finally, petitioner claimed and respondent disallowed a deduction of $4,078.98 in 1954 for Repairs and Maintenance. Petitioner offered no testimony directly relating to this item. However, after considering the record as a whole, we have determined a reasonable allowance of $500. Capital Gain Increase - 1953 Findings of Fact Respondent increased petitioner's net long-term capital gain in 1953 by $12,482.39. Petitioner has conceded $4,330.22, the portion of the adjustment relating to unreported gain on the sale of a piece of real estate known as the Plymouth Road property. The remaining $8,152.17 increase is derived as follows: Claimed basis
Allowed basis
Adjustment
Detroit Edison stock
$38,626.63
$27,000.00
$11,626.63
Other securities
11,225.00
7,257.50
3,967.50
Subtotal
15,594.13
Carry forward of loss on sale of
710.21
gas station equipment
Total
$16,304.34
One-half thereof
$ 8,152.17
*136 The gain reported by petitioner in 1953 on the sale of Detroit Edison stock included $705.93 gain on certain shares sold in 1952 but erroneously reported in 1953. Petitioner has conceded an increase in that amount in net long-term capital gain for 1952. Opinion The petitioner is not entitled to any loss on the sale of the gas station equipment [19] and therefore the loss carry forward of $710.21 is not allowed. Because petitioner was unable to provide evidence of actual cost, respondent's agent determined cost for the securities by using the lowest price at which the security sold in the year it was acquired. Petitioner has offered no proof of error in respondent's adjustments with respect to any of the securities except Detroit Edison. Here the proof consists simply of records produced by an agent of Detroit Edison showing the date petitioner's stock was registered in petitioner's name and the stock's market price on that date. As respondent correctly points out, the price at which petitioner acquired the stock on an earlier date may well have differed from its price on the day the stock was registered. Petitioner further argues *137 that a portion of the Detroit Edison stock reported as sold on his 1953 return was actually sold in 1952. Petitioner's 1953 tax return fails to indicate the number of shares sold in 1953, but, viewing this tax return in conjunction with the records made available by Detroit Edison, it is apparent that petitioner did indeed report the sale of more shares of Detroit Edison than were actually sold in that year. Because of the inadequacy of the available records, we have no way of determining the precise number of shares erroneously included. However, petitioner has conceded an increase to his 1952 capital gain in the amount of $705.93 with respect to unreported gain on the sale of Detroit Edison 1204 stock. This gain apparently derives from securities whose sale petitioner reported in 1953. Accordingly, we have reduced respondent's increase to 1953 capital gain by $705.93. Except for this adjustment, petitioner has failed to prove error and the balance of respondent's increase with respect to the gain on the sale of Detroit Edison stock in 1953 is sustained. Rent Findings of Fact Petitioners claimed deductions for rent paid to Hamilton Corporation [20] for a Florida apartment, *138 to the clinic at 215 Highland, and for a cottage as follows: Year
215 Highland
Florida apartment
Cottage
Total rent
Avenue
claimed
1955
$14,150
$ 4,700
$1,000
$19,850
1956
21,000
0
0
[21] 21,300
1957
21,000
11,100
0
32,100
1959
21,084
10,000
0
31,084
1960
21,120
10,000
0
31,120
1961
21,600
10,000
0
31,600
Respondent allowed rent of $6,000 per year with respect to the 215 Highland Avenue Property and disallowed all other amounts claimed under rent. The property at 215 Highland Avenue served as a clinic and an office of petitioner. Hamilton Corporation rented out portions of the building to other doctors. Respondent's revenue agent's report indicates that the *139 other tenants paid rent totaling $9,000 per year. Six thousand dollars is a reasonable rent for the portion of the building occupied by petitioner. Opinion Respondent allowed petitioner a deduction of $6,000 per year for rent with respect to the clinic at 215 Highland Avenue. While this amount would be insufficient rent for the entire building, it is clear that portions of the building were rented out to other doctors. Absent evidence as to what portions of the building were used by petitioner and the other doctors, we have no way of determining a reasonable rent for the building as a whole. The only information we have is that, according to the revenue agent's report, the other tenants paid annual rent of $9,000. That petitioner actually paid most of the claimed amounts is not determinative, since he and Joan were the sole stockholders of Hamilton. This factor made it incumbent upon petitioner to introduce evidence from which it could have been determined that the excess over $6,000 was rent and not something else such as a contribution to the capital of Hamilton. Petitioner also claimed a rent deduction with respect to an apartment in Florida. He testified at length with *140 respect to this apartment, but failed to convince us that it was a business expense, as opposed to a personal expense, for a Detroit osteopathic surgeon to maintain a Florida apartment. Petitioner has offered no evidence which would justify allowance of $1,000 rent for any cottage. It is not even clear from the record what cottage is involved. Petitioner also claimed a deduction of $300 in 1956 for a payment to Dr. E. Deane Elsea. It is peculiar, to say the least, that a business payment to Dr. Elsea would be deducted under the category of rent and petitioner has failed to adduce evidence upon which we could even infer that this item constituted a deductible expense. Accordingly, petitioner having failed to prove error in respondent's disallowance of rent deductions, respondent's adjustments are sustained. Oil Well Loss Findings of Fact Petitioner claimed a loss on an oil well in the amount of $3,500 in 1956 and $126.18 in 1957. Respondent disallowed the entire loss. Petitioner invested $4,000 in the oil 1205 well in 1956 and $126.18 in it in 1957 as his share of the drilling and completion costs. He visited the site of the oil well at some time in the vicinity of *141 February 1957 and determined that the oil well which had been drilled was a dry hole. Petitioner received only a minimal return on this investment. The hole was dry as of 1957. Petitioner suffered a loss of $3,626.18 (the amount claimed) on his investment in the oil well in the year 1957. Opinion Petitioner testified, and respondent concedes, that petitioner invested $4,000 in 1956 and $126.18 in 1957 as his share of the drilling and completion costs of an oil well. Petitioner contends the well became worthless in 1956, but he has failed so to prove. However, petitioner's testimony was sufficient to establish that the well was worthless as of 1957 and we have allowed an oil well loss for that year. Accordingly, we hold that petitioner is entitled to the loss of $3,626.18 claimed by him but that the entire loss is to be allowed in 1957, with no loss being allowed in 1956. Exemptions Findings of Fact Petitioner claimed, inter alia, $600 exemptions - for his grandchildren William and Susan Potts (the children of his daughter, Beverly) in 1950 through 1952, for his three children Ray, Thomas, and Nancy in 1953 through 1957, for Thomas and Nancy in 1959 and 1960, and for *142 Nancy in 1961. Respondent disallowed all of these claimed exemptions on the ground that petitioner failed to prove he provided over half their support. During the years 1950 through 1952, petitioner was the sole source of support for William and Susan Potts. Beverly's husband, William, was in college at the time. The support was provided directly in the form of clothing purchased for the children and indirectly by payments to Beverly or her husband to be used for the support of the children. Ray, Thomas, and Nancy were all beneficiaries of a special trust for 1953 and all subsequent years at issue. Ray and Thomas also had earned income during some of the years at issue. None of the income from these trusts and none of the earned income was used for the support of petitioner's children. Petitioner provided over half the total support for each of his children for each year in which respondent disallowed the claimed exemption. For each of the years in which respondent disallowed claimed exemptions for petitioner's children, each child was a full-time student. Opinion At issue here are exemptions for petitioner's two grandchildren, Willi am and Susan Potts, for 1950 through 1952 *143 and for petitioner's children, namely, Ray for 1953 through 1957, Thomas for 1953 through 1957, 1959, and 1960, and Nancy for 1953 through 1957, and 1959 through 1961. Petitioner and Beverly Potts, petitioner's daughter and the mother of William and Susan, both testified that during the years 1950 through 1952 petitioner was the sole source of support for the grandchildren. Neither Beverly nor her husband had any income to support the children. The only "income" of Beverly and her husband was the rents from the Plymouth Road property and certain dividends on Detroit Edison stock. Petitioner has now conceded these items to be his income. Respondent can not have it both ways. For 1953 and all subsequent years at issue, the children were the beneficiaries of certain trusts, and in some of the years, Ray and Thomas had earned income. We are satisfied that none of the income from the trusts and none of the children's earned income was used for their support. Accordingly, we held that all exemptions claimed by petitioner are allowable. [22]
*144 Itemized Deductions - Legal Fees and Professional Fees Findings of Fact Petitioners claimed and respondent allowed deductions claimed for legal and professional fees [23] as follows: 1206 Year
Amount claimed
Amount allowed
Amount still
by respondent
at issue
1950
$ 9,929.73
$1,862.50
$ 8,067.23
1951
3,871.10
1,285.00
2,586.10
1952
2,654.02
1,630.00
1,024.02
1953
14,298.25
0
14,298.25
1954
5,090.66
650.00
4,440.66
1955
$ 4,539.88
$1,001.95
$ 3,537.93
1956
5,608.37
1,150.00
4,458.37
1957
3,331.59
0
3,331.59
1961
31,275.00
7,025.00
24,250.00
The amounts at issue included certain amounts substantiated as to payment to the following: 1950
1951
* 1952
1953
1954
1955
1956
1957
1961
Joseph Platt
Doyle & Platt
$5,456
$149
$ 764
$ 2,287
Wm.
500
Laugenbacker
Edward Thomas
500
Ray Cashen
373
111
825
0
$ 176
Lewis &
200
Watkins
Charles F.
156
Short, Jr
Edward
0
550
Halligan
Harry Blanton
0
0
250
Paul Marco
0
0
0
997
Haddad Alford
0
0
0
5,000
& Co.
Paul W.
0
0
0
5,638
3,944
$3,150
$3,553
$3,331
$10,000
Walters
R. W. Harris
0
0
0
350
0
0
0
0
0
Clement J.
0
0
0
0
100
0
0
0
0
Waldman
Bert Haddad
0
0
0
0
100
0
0
0
14,250
Samuel J.
0
0
0
0
120
0
0
0
0
Hameguay
U.S. Court of
0
0
0
25
0
0
0
0
0
Appeals
$7,185
$810
$1,839
$14,297
$4,440
$3,150
$3,553
$3,331
$24,250
*145 The remaining amounts disallowed were unverified as to the fact of expenditure. Commencing in 1949, petitioner's income tax affairs were under investigation by a special agent of the Internal Revenue Service. Petitioner was thereafter indicted on three counts of income tax evasion charging criminal fraud in connection with the preparation and filing of his own and Joan's 1946 and 1947 income tax returns. The litigation which ensued included an interlocutory appeal to suppress certain evidence, consisting of records showing petitioner's business income which petitioner contended were unconstitutionally seized. Petitioner lost on appeal and the Supreme Court denied certiorari. Biggs v. Commissioner, 246 F. 2d 40 (C.A. 6, 1957), certiorari denied 355 U.S. 922. Petitioner then pled guilty in 1958 to a count charging that he had caused the filing of a fraudulent return for his wife for 1947. The other two counts against him were dropped and petitioner was fined $10,000. Also outstanding at the time of the criminal *146 litigation was certain potential civil tax litigation in connection with the same years. Petitioner hired many lawyers and other persons in connection with the civil and criminal investigations of his income tax returns. Of the amount claimed and disallowed in 1954, $100 was paid to Clementt J. Waldmann, an attorney who handled many of the normal legal problems resulting from petitioner's profession, and is an ordinary and necessary business expense. In addition to the amounts already allowed by respondent and including the $100 paid to Waldmann in 1954, one half of the amounts paid to Joseph Platt, Doyle & Platt, William Laugenbacker, Edward Thomas, Ray Cashen, Lewis & Watkins, Charles R. Short, Jr., Paul Marco, Paul W. Walters, and R. W. Harris are allowable deductions as expenses in connection with the determination of petitioner's liability for his own taxes. Opinion Under this category, respondent concedes that the major portion of the amounts claimed was spent. The real difficulty lies in determining which of these amounts are allowable deductions. Respondent has provided us with certain parameters. First, he concedes that under Commissioner v. Tellier, 383 U.S. 687 (1966), *147 the issue of public policy is no longer involved with 1207 respect to the unsuccessful defense of criminal charges. Second, he concedes that to the extent that petitioner's expenditures were in fact incurred and paid in connection with controversies involving petitioner's own tax liabilities, they are deductible under section 212(3) of the Internal Revenue Code of 1954 for the years 1954 and subsequent years and under section 23(a) (2) of the Internal Revenue Code of 1939 for the years prior to 1954. Respondent contends, however, that, to the extent that petitioner's expenditures were attributable to his involvement in the filing of his wife's tax returns, they are not deductible. As far as section 212 (3) of the Internal Revenue Code of 1954 and section 23(a)(2) of the Internal Revenue Code of 1939 are concerned, we think respondent is correct. These sections deal with deductions relating to a determination of a taxpayer's own liability for taxes and not the liability of another.[24] Whether petitioner's expenditures in connection with his criminal involvement in his wife's returns might be deductible as a business expense under *148 section 162 of the Internal Revenue Code of 1954 or section 23(a)(1) of the Internal Revenue Code of 1939, we need not now decide. Petitioner has made no claim, nor presented any evidence, that such defense thereof was sufficiently related to the continuing success of his professional activities to sustain a claim for deduction under either of those sections. Cf. Paul Draper, 26 T.C. 201 (1956). Similarly, in view of respondent's concession as to the applicability of section 212(3) and 23(a)(2), we need not explore the extent to which petitioner's expenditures in connection with the civil and criminal charges of his own liability for taxes are deductible as an ordinary and necessary business expense. Cf. Paul Caspers, 44 T.C. 411 (1965). Within the foregoing *149 context, we have endeavored to determine the extent of the deductions to which petitioner is entitled for expenditures in connection with the civil and criminal investigations of his own and his wife's income tax returns for 1946 and 1947. The evidence consists mostly of petitioner's own general and confusing testimony. No effort was made by petitioner to supply original or duplicate bills from the recipients of payments, describing the nature of the services rendered, although petitioner's counsel stated such bills would be submitted and the Court indicated that it was most desirous of receiving the same. However, we are satisfied that certain payments, in fact made to certain named individuals, were to a substantial degree related to questions with respect to petitioner's own tax liabilities and, in the absence of any firm evidence as to allocation, we have allowed, as our findings of fact show, one half of such payments as having been made for professional services in connection with the determination of these liabilities. The other amounts involved were not sufficiently verified to permit any allowable deduction. In this connection, we have made no allowance with respect to the *150 payments in 1961 to B. Haddad and Paul Walters. Petitioner's involvement with respect to the years 1946 and 1947 was terminated by his plea of guilty to one count in 1958. We think it was incumbent upon petitioner to produce some probative evidence as to the nature of the services for which these payments were made three years later, particularly since substantial payments, at least to Paul Walters, are included in our calculation of the allowances for prior years. Amounts paid to other persons and other amounts unverified as to the fact of payment have not been allowed to any extent in view of the fact that the record herein is utterly silent with respect to these items. Respondent also disallowed certain other legal expenses in addition to those connected with petitioner's tax case, including some apparently connected with an automobile accident involving his daughter, which are clearly personal and therefore nondeductible. The evidence with respect to these legal expenses is meager. Except for $100 which petitioner paid to Clement J. Waldmann in 1954, petitioner has provided no basis for allowing any other legal expenses beyond those allowed by respondent and the legal expenses *151 we have already determined allowable. Waldmann testified that all legal fees paid to him would be ordinary and necessary expenses of petitioner's profession. We have accordingly allowed the $100 claimed to have been paid to Waldmann in 1954. 1208 Itemized Deductions - Contributions Findings of Fact Respondent disallowed certain of petitioners' claimed charitable contributions as follows: Year
Donee
Amount
Amount allowed
Amount
claimed
by respond- ent
still at
issue
1951
Our Savior Church
$ 8,000
$6,000
$2,000
1956
Emerald Ball Committee
200
0
200
1960
St. Peter's Home for Boys
11,000
3,000
8,000
In 1951 petitioner contributed a total of only $6,000 to Our Savior Church. In 1960 petitioner contributed his converted PT Boat [25] to the St. Peter's Home for Boys. The boat was stored and not used by the Home. It was advertised for sale by the Home. The Home turned the boat over to one Eckleson, the chairman of its finance committee, who traded the boat for two parcels of real estate and then gave the Home $3,000 in December 1962 after he had sold the lots. The boat at the time of the gift had a fair market value *152 of $11,000. Opinion The evidence as to the amount contributed to Our Savior Church in 1951 is extremely skimpy. We hold it is insufficient to sustain any contributions in excess of the substantial amount already allowed by respondent. Respondent disallowed a claimed charitable deduction for a gift in 1956 to the Emerald Ball Committee. Petitioner has failed to prove that he actually made the gift or that the Committee is an organization of the type that gifts to it would be deductible. [26] Petitioner claimed a deduction in 1960 of $11,000 as the value of his converted PT Boat which he donated to St. Peter's Home for Boys. Petitioner called one expert witness who testified that at the time of the gift he had placed a value of $11,000 on the boat. We found him a convincing witness. On the other hand, the Home received only $3,000 for the boat two years later. The facts are, however, that the boat was stored and not used by the Home for two years, there is no evidence that it was maintained in a state of good repair *153 during that period, and the Home did not sell the boat directly to the ultimate purchaser. Finally, respondent's witness had little firsthand knowledge of the efforts of the Home to sell the boat. Under all these circumstances, the $3,000 is doubtful evidence of value. Accordingly, we have accepted a value of $11,000 and so found. Itemized Deductions - Interest Findings of Fact Petitioner claimed deductions for interest of $427.51 and $926.22 for 1951 and 1953, respectively, of which respondent has allowed $394.19 and $798.66, respectively. In computing the net rental income which petitioner had failed to report and which he now concedes he should have reported in 1953, respondent allowed the $127.56 still in issue for that year. Opinion Respondent has allowed a major portion of the amounts claimed by petitioner for interest in 1951 and 1953. Petitioner has failed to prove payment of interest in excess of the amounts allowed by respondent. Accordingly, no deduction is allowed in excess of those amounts. Itemized Deductions - Taxes Findings of Fact Petitioner claimed itemized deductions for taxes in 1952, 1953, and 1954 in the amounts of $69.27, $47.70, and $77.79, *154 respectively. Respondent disallowed all of these amounts on the ground that they were Social Security taxes paid with respect to petitioner's maid and, accordingly, were personal expenses. Opinion Petitioner claimed itemized deductions in 1952 through 1954 for Social Security taxes 1209 with respect to his maid. The amounts we allowed as reasonable expenses under Secretarial and Other Services [27] make allowance for fringe expenses such as Social Security taxes. They are not deductible qua taxes. Section 23(c), I.R.C. 1939, and section 164, I.R.C. 1954. Accordingly, the deductions claimed herein are denied. Itemized Deductions - Other Findings of Fact Respondent disallowed a deduction claimed by petitioner in 1951 in the amount of $3,000 for a purportedly uncollectible note from a Dr. Zielinski. Petitioner loaned $3,000 to Dr. Zielinski around 1950 or 1951. Zielinski died before repaying the loan. Petitioner made no attempt to collect the loan. In 1952, petitioner claimed a miscellaneous deduction of $1,468.86, of which $1,200 was represented by purported cash expenditures. The only explanation of this *155 item is that it was for West Branch Caretaker, insurance, etc. Respondent allowed $268.86. In 1954, petitioner claimed a loss of $700 on the sale of a 1951 Cadillac, all of which was disallowed by respondent. The Cadillac was not used by petitioner in his business. In 1956, petitioner claimed a deduction of $450 for travel, all of which was disallowed by respondent. One hundred and twenty-five dollars of these expenses was incurred in connection with the determination of petitioner's liability for income taxes. In 1960, petitioner claimed a fire loss of $32,288.32 in connection with a fire in December 1960 which totally destroyed a cottage owned by petitioner at Clear Lake, near West Branch, Michigan. Petitioner and Joan had acquired the cottage three or four years before the fire. Lucille had assisted in the paper work at the time of acquisition. To clarify some confusion in the record of title, Lucille gave petitioner and Joan a quitclaim deed in July 1960. Lucille never had actual title to the cottage and petitioner and Joan were at all times pertinent the owners thereof. The cottage had been completely rebuilt approximately three years before the fire at a cost of approximately *156 $39,000. At the time of the fire the cottage was worth $34,000. The cottage was only insured for $20,000, upon which petitioner collected in full. Also destroyed at the time of the fire was substantial personal property belonging to petitioner and Joan. This personal property had been acquired between 1957 and 1960 at an original cost of $21,416.75. In addition, the fire further destroyed a lawn and certain trees and shrubbery which petitioner had added at a cost of $608.79. At the time of the fire, the personal property and landscaping had a value of $14,683.69. Petitioner had insurance of $9,250 applicable to this property, upon which he collected in full. Petitioner incurred a loss from the fire of $19,433.69. Opinion In addition to the items already dealt with separately, [28] petitioner claimed certain other itemized deductions consisting of an uncollected note in 1951, expenditures for the West Branch caretaker, insurance, etc., in 1952, loss on sale of a car in 1954, travel in 1956, and a fire loss in 1960. We have made findings of fact applicable to each of these deductions. *157 Petitioner offered very little testimony with respect to the uncollected note claimed in 1951. He stated that he had loaned a Dr. Zielinski $3,000 and that Zielinski died shortly thereafter with insufficient funds to repay petitioner. Petitioner offered no testimony indicating that he had actually tried to collect the note or to prove that Zielinski died with no available assets. While petitioner may have been very kind in declining to pursue collection from Zielinski's estate, petitioner has failed to prove the note uncollectible. Petitioner has offered no testimony to show that the amounts disallowed in 1952 were in fact spent or to show why payments for "West Branch caretaker, insurance, etc." would be deductible. Accordingly, respondent's determination is sustained. Petitioner claimed a loss in 1954 on the sale of a 1951 Cadillac. Under the category Auto Expenses and Depreciation (Auto), [29] we have already sustained respondent's determination that depreciation would not be allowable with respect to this car. For the same reasons for which we upheld respondent's determination as to depreciation, we disallow the loss herein. 1210
*158 Petitioner claimed $450 for travel expenses in 1956, alleged in connection with his tax case. While the evidence in this regard is meager, we are satisfied, as our findings of fact show, that a portion of this expense has been substantiated as expended for necessary income tax travel in connection with petitioner's income tax liabilities and is therefore deductible under section 212(3) of the Internal Revenue Code of 1954. Petitioner claimed a deduction in 1960 in connection with a fire which totally destroyed petitioners' cottage at Clear Lake, near West Branch, Michigan. Petitioner adequately documented his original cost and the dates of acquisition of the real and personal property which were destroyed. Based on this evidence, we have determined, as our findings of fact show, the value and the allowable loss in excess of the insurance recovery. Gain on Transfer of Property to the Hamilton Corporation Findings of Fact Respondent determined that petitioners realized ordinary income of $16,449.64 in 1955 on the transfer of certain property to the Hamilton Corporation in exchange for 100 percent of its stock, the assumption of certain liabilities, *159 a note, and cash. In early 1955, petitioner transferred to the Hamilton Corporation property having an adjusted basis as follows: Description of
Cost
Allowable
Adjusted basis
property
depreciation [30]
215 Highland (Bldg.)
$112,896.19
$ 6,487.97
$106,408.22
11025 Gratiot (Bldg.)
27,800.00
6,926.00
20,874.00
Furniture & Fixtures
21,978.63
5,063.01
16,915.62
Gas station
27,839.12
4,951.65
22,887.47
Total
$190,513.94
$23,428.63
$167,085.31 In exchange for the foregoing, petitioner received property having a fair market value as follows: Property received
Fair market
value
100 percent of the stock of Hamilton Corporation
$ 94,328.86
Mortgages assumed by Hamilton Corporation
36,250.00
Demand promissory note
25,000.00
Cash
3,756.42
$159,335.28 Petitioner realized no gain on the above transfers. Opinion Both parties concede that the transaction is within the confines of both sections 351 and 1239 of the Internal Revenue Code of 1954. Both parties have also treated the transaction *160 on a unitary basis and have made no contention with respect to the tax consequences that might ensue if the transaction were segmented with respect to each item of property transferred. The dispute essentially centers upon whether in fact petitioner realized any gain at all. We see no need to delineate the various elements which enter into our decision. Although the record, as is the case with so many of the issues herein, is confusing and incomplete, we are satisfied that a substantial amount of furniture and fixtures was transferred - whether at 215 Highland or 11025 Gratiot, or both, is not entirely clear. Our findings of fact set forth our conclusions with respect to the adjusted basis and the fair market value of the property transferred and show that no gain was realized. In this connection, we note that the increase in the cost of the improvements to the 215 Highland building from $67,746.37, as shown in the revenue agent's report, to $88,869.79, as now conceded by respondent, is in excess of the amount of the gain asserted. In view of our conclusions, we need not concern ourselves with the unitary versus the segmented approach under section 351 or the relationship between *161 sections 351 and 1239. See E. D. Rivers, Jr. [Dec. 28,884], 49 T.C. 663, 669 (1968); Bittker-Eustice, Federal Income Taxation of Corporations and Shareholders (2d ed. 1966), p. 78. Fraud and Negligence Findings of Fact Petitioner knowingly and intentionally failed to report items of income and/or took excessive deductions in each of the years 1950 through 1957. Part of the deficiency in petitioner's income tax for those years was due to fraud. 1211 Part of the deficiency in income tax for each of the years 1959, 1960, and 1961 was due to negligence or intentional disregard of rules and regulations. Petitioner failed to make and file a timely declaration of estimated tax for the year 1950 and such failure was not due to reasonable cause. Opinion We will deal first with the 5 percent addition to tax asserted by respondent for each of the years 1959 through 1961 under section 6653(a) of the Internal Revenue Code of 1954. [31] On this issue the burden of proof is on the petitioner. See David Courtney [Dec. 22,425], 28 T.C. 658, 669 (1957). *162 Petitioner's books and records were inadequate, to say the least. To the maximum degree, petitioner deliberately resolved all doubts in his favor. Particularly with respect to his deduction for so-called business expenses, he made no real attempt to determine whether the claimed expenditures were in fact made in the amount claimed or were properly deductible. His attitude was one of indifference, if not of downright disdain, for his responsibilities as a citizen and taxpayer. At the very least, he knowingly and intentionally traveled on thin ice. Petitioner has failed to convince us that he was not negligent and did not intentionally disregard rules and regulations. Respondent's determination under section 6653(a) is sustained. We now turn to the assertion by respondent of the 50 percent addition to tax for fraud under section 293(b) of the Internal Revenue Code of 1939 for the years 1950 through 1953 and under section 6653 (b) of the Internal Revenue Code of 1954 for the years 1954 through 1957. On this issue, the burden of proof is on the respondent but it is *163 necessary that only a part, and not all, of the deficiency for the particular year be due to fraud. E.g., Arlette Coat Co., 14 T.C. 751 (1950). To meet his burden, respondent need not produce direct evidence of fraud. Indirect evidence will suffice, provided only that it is clear and convincing. As we stated in Luerana Pigman, 31 T.C. 356 (1958), at p. 370: It should be noted at the outset that our conclusion in these respects must be based upon consideration of the entire record properly before us, and that we are not limited to a consideration of respondent's affirmative evidence. Frank Imburgia, 22 T.C. 1002 (1954); Wallace H. Petit, 10 T.C. 1253 (1948); L. Schepp Co. [Dec. 7419], 25 B.T.A. 419 (1932). We also recognize that in this, as in many fraud cases, the proof of fraud, if it is to be established, must depend in some aspects upon circumstantial evidence. Fraudulent intent can seldom be established by a single act or by direct proof of the taxpayer's intention. It is usually found by surveying his whole course of conduct and is to be adduced as any other fact from all the evidence of record and *164 inferences properly to be drawn therefrom. M. Rea Gano, 19 B.T.A. 518 (1930). See also Jacob C. Ehrlich, 31 T.C. 536, 540 (1958). With the foregoing considerations in mind, we have carefully considered all of the evidence in the record before us and conclude that respondent has met his burden. Some, but not all, of the elements each of which have influenced our determination that petitioners pattern of conduct was permeated with fraud are the following: (1) Petitioner was a highly intelligent, sophisticated man. We are convinced that he knew what he was doing every inch of the way. Cf. Eugene Vassallo, 23 T.C. 656 (1955). While petitioner had an accountant prepare his returns, he can find little shelter in this fact. It is all too clear that petitioner made the controlling determinations as to what income was to be reported and what deductions were to be taken. We are satisfied that the accountant was little more than petitioner's amanuensis. (2) In each of the years 1950 through 1954, petitioner deliberately did not report income such as the dividends on the Detroit Edison stock and rents from the Plymouth Road property, although *165 he remained the owner of the assets themselves. His self-serving testimony that he thought that the mere direction to pay the income to his children would relieve him of tax liability is too facile to be believable. We think he was fully aware of the fact that such income should nevertheless be 1212 reported by him but thought that as long as it was reported by his children he could "get away with it" and thereby enable the family group to pay less taxes. We also note that, in each year 1950 through 1957, petitioner did not report interest income, although in several of the years the amounts omitted were substantial. While this omission standing alone might not have been sufficient to persuade us to find fraud, it is an element of a total pattern which we cannot ignore. We are aware of the fact that the parties have stipulated that neither the existence or nonexistence of fraud should be inferred from the fact that these items were settled and we have expressly not considered the fact of settlement in this regard. But settlement or no settlement, these items were taxable to petitioner and we are satisfied that he was at all times aware that they were. Certainly, petitioner furnished *166 us with no evidence from which we might have concluded that there was a question as to his taxability, although he was free to do so under the stipulation of facts. (3) In each of the years 1950 through 1957, petitioner deliberately deducted the payments to the Detroit Osteopathic Hospital staff assesment loan program although he received notes in return. The testimony is clear that petitioner knew they were loans and that he deducted the payments, not because he thought he was entitled to do so, but simply because he determined that he could not afford not to do so. (4) In each of the years 1950 through 1957, petitioner took large deductions for numerous alleged business expenses. Much of it was in the form of cash - running from a low of $14,700 in 1950 to a high of $22,015 in 1955. We recognize that petitioner was a big earner and a compulsively big spender. But it is clear from the record herein that he was more than simply generous in his determinations of the amounts which he spent and the alleged business purpose served thereby. Not only did he consistently resolve all doubts in his favor but we are satisfied that he followed the same course when there were no doubts at *167 all or when the doubts were at best a figment of his imagination. Moreover, we think that some evidence of fraudulent intent is reflected in the fact that in many instances the total amount of some type of expense was distributed among various categories of deductions on petitioners' returns. The fact that excessive deductions rather than omissions from income were involved provides no basis for rejecting respondent's claim of fraud. Cf. Estate of Louis L. Briden, 11 T.C. 1095, 1133 (1948), affirmed sub nom. Kirk v. Commissioner, 179 F. 2d 619 (C.A. 1, 1950). Nor do we consider it significant that respondent chose to claim fraud for 1950 through 1957 but not 1959 through 1961, although there were substantial disallowances in the later years as well. This does no more than indicate that respondent may have been too lenient with respect to the later years. We are cognizant of the fact that mere omissions from income or mere excessive deductions are not in and of themselves proof of fraud. Similarly, incomplete, inadequate, or even nonexistent books and records do not per se amount to fraud. The same is true of the facts that, throughout the years involved, *168 petitioner knew that his tax affairs were under continuous investigation and that he was subsequently indicted and convicted of income tax evasion, albeit for other years. But, although these elements standing alone are insufficient, they are relevant tiles in a mosaic of fraud. "Though an isolated erroneous tax figure cannot be escalated or pyramided into fraud, a confraternity of similar errors can take on more sinister tax aspects." See Webb v. Commissioner, 394 F. 2d 366 (C.A. 5, Apr. 23, 1968). We are satisfied that such a "confraternity" or mosaic existed in this case throughout the years 1950 through 1957. In Charles E. Mitchell, 32 B.T.A. 1093 (1935), the addition to tax for fraud was imposed in the context of the following statement at p. 1128: Under the revenue laws every taxpayer is, in the first instance, his own assessor. He determines the amount of tax due. This privilege carries with it a concurrent responsibility to deal frankly and honestly with the Government - to make a full revelation and fair return of all income received and to claim no deductions not legally due. This responsibility is not properly discharged by resolving all doubts *169 against the Government, or by giving effect to studied efforts to wipe out taxable income by secret and questionable practices. It is a maxim of our law that, in dealing with the Government, taxpayers must turn square corners. 1213 Petitioner's motto was "deduct now, pay later - if they catch me." He clearly failed to discharge his responsibilities as laid down in the Mitchell case by egotistically and intentionally placing himself above the tax laws. He exhibited such a "blatant disregard of the minimum responsibility of every taxpayer" (see Eugene Vassallo, supra, at p. 664) that it is impossible for us to believe that he could have acted innocently and in good faith. Respondent's determination of the 50 percent addition to tax for each of the years 1950 through 1957 is sustained. With respect to the year 1950, respondent asserted an addition to tax, under section 294(d)(1)(A) of the Internal Revenue Code of 1939, for failure to make and file a declaration within the time prescribed by law. Petitioner introduced no evidence on this score. Since the burden of proof was on petitioner to show that such failure was due to reasonable cause, respondent's determination *170 is sustained. Decisions will be entered under Rule 50. Footnotes
*. The taxable year 1958 is not before us.↩
*. The amount "at issue" often does not represent the sum of the last two columns because of items such as depreciation which are "at issue" but are not reflected in either of such columns.↩
1. Petitioner Raymond A. Biggs was the principal witness on most of the items of deduction. Often he admitted that he could not remember the specific nature of the purported expense, particularly where cash was involved, and contented himself with such generalities as "I would have remembered it in the year of the deduction" or "If I claimed it as a deduction, it was a business expense."↩
*. Includes $1,287.39 paid to Dr. E. Deane Elsea.↩
2. Compare Entertainment and Promotion, p. 20, infra, and Depreciation (Boat), p. 24, infra, dealing specifically with the PT Boat.↩
3. See p. 50 [p. 1199] infra.↩
4. See p. 24 [p. 1190], supra.↩
5. See p. 50 [p. 1199], infra.↩
6. Additional amounts with respect to these loan programs were claimed by petitioner and disallowed by respondent under the category of "Hospital Fees and Expenses." See p. 41 [p. 1195], infra.↩
7. See "Duties and Subscriptions," p. 38[p. 1194], supra, for the details of this program.↩
8. The amounts claimed in all years are in addition to amounts claimed under the category of "Paid to Dr. Harold Jones," which has been treated as a separate issue. See p. 44, supra. The amount claimed in 1952 is also in addition to $41,933.30 claimed as paid to various other doctors under "Income from Clinic," all of which was allowed by respondent.↩
9. The amount claimed in 1961 is substantially in excess of the amounts claimed in other years because of a change in accounting by petitioner. The amount includes referral fees, which in the other years had been treated separately.↩
10. For example, in 1950, the amounts at issue were purportedly paid to various hotels. Pike's work papers indicate that travel was claimed in 1950 under "Entertainment and Promotion." We make a substantial allowance for "Entertainment and Promotion" in 1950. See p. 20 [p. 1188], supra.↩
11. See "Secretarial and Other Services and Salaries," p. 15 [p. 1174], supra.↩
12. See p. 38 [p. 1194], supra.↩
13. See "Paid to Other Doctors," p. 45 [p. 1197], supra.↩
14. We make no additional allowance with respect to Folkman, who may well have worked for petitioner during a part of 1951, since the amounts paid to him in that year ($1,187.08 on 1/5/51 and $732.52 on 2/7/51) are less than the amount allowed by respondent. Moreover, we note that Folkman was paid $1,187.08 shortly after the end of 1950, a sum surprisingly similar to the $1,187.60 claimed and allowed as a deduction to petitioner for that earlier year. If, as petitioner's testimony indicates, Folkman only worked for him for three or four weeks in 1950, then that deduction provides petitioner with the full benefit to which he is entitled.↩
15. This gas station equipment relates to the same gas station involved in the category of "Loss from Gas Station." See p. 55 [p. 1201], supra.↩
16. We note that if petitioner were required to reduce the acquisition cost by the $1,727.38 claimed depreciation, there would appear to have been a profit. Respondent has made no claim in this regard and we accordingly do no more than sustain his disallowance of petitioner's loss. Similarly, we do not need to consider the extent to which section 117(j) of the Internal Revenue Code of 1939↩ would have entitled petitioner to an ordinary deduction if he had sustained a loss.
17. No additional depreciation is allowed for 1952 to reflect the conceded increase in basis, since respondent at trial and on brief conceded that an additional $747.90 was allowable for that year.↩
18. The issue of depreciation on the furniture and fixtures for 1954 seems to have been ignored by both parties, with the result that we have no way of determining what, if any, adjustment in this regard might be in order for that year.↩
19. See p. 56 [p. 1201], supra. ↩
20. The details of the acquisition of the 215 Highland Avenue property by petitioner and the circumstances surrounding its transfer to Hamilton Corporation are set forth under "Depreciation and Repairs and Maintenance" (see p. 58 [p. 1202], supra) and under "Gain on Transfer of Property to the Hamilton Corporation (see p. 81, infra) and are incorporated herein by this reference. ↩
21. The additional $300 represents an amount paid to Dr. E. Deane Elsea.↩
22. Respondent has not claimed that any child had income in excess of $600 in 1953, which, if he had done so, would have raised an issue as to which petitioner would have been required to produce additional evidence in order to sustain his burden of proof. Compare section 25 (b)(1)(D), I.R.C. 1939, as amended, with section 151(e), I.R.C. 1954↩.
23. In all years except 1961, the legal or professional fees at issue were claimed under Itemized Deductions. In 1961, they were claimed as a business expense on Schedule C of petitioner's return.↩
*. Respondent allowed $865 of the total amount listed, without allocation to particular items, making a net disallowance of $1,024.02.↩
24. We note that the years involved in the prior investigation and prosecution of petitioner were 1946 and 1947, when joint tax returns by husband and wife were not permissible. We also note that no claim has been made that payments by petitioner with respect to Joan's tax liabilities constituted gifts to her and should therefore be treated as payments made on her behalf.↩
25. See "Depreciation (Boat)" for a further description of this boat, p. 24 [p. 1190], supra.↩
26. See also "Office Supplies," p. 36 [p. 1194], supra.↩
27. See p. 15 [p. 1186], supra.↩
28. See "Oil Well Loss," p. 66 [p. 1204], supra, with respect to a miscellaneous deduction of $126.18 claimed in 1957.↩
29. See p. 28 [p. 1191], supra.↩
30. Includes depreciation allowed elsewhere. See "Depreciation, Etc.," p. 58 [p. 1201], supra.↩
31. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes. - If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.↩